**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTOPHER WELLER, on behalf of himself and all others similarly situated,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No. 5:17-cv-02292-JLS** |
| **DOLLAR GENERAL CORPORATION, DOLGENCORP, LLC,** | § § § | |
| **Defendants.** | § | |

# DEFENDANT DOLGENCORP, LLC'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND CONDITIONAL COLLECTIVE ACTION CERTIFICATION

Respectfully submitted,


Joel S. Allen (*Pro Hac Vice*)
Texas Bar No. 795069
jallen@mcguirewoods.com
Melissa M. Hensley (*Pro Hac Vice*)
Texas Bar No. 00792578
mhensley@mcguirewoods.com
McGuireWoods LLP
2000 McKinney Avenue
Suite 1400
Dallas, Texas 75201
Telephone: 214.932.6400
Facsimile: 214.932.6399

Joseph L. Gordon
Pa. Bar No. 209075
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
1818 Market St., Suite 3402
Philadelphia, PA 19103
jlg@pietragallo.com
Telephone: 215-320-6200
Facsimile: 215-754-5181

ATTORNEYS FOR DEFENDANT

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 4

A. Dollar General's Distribution Centers ..... 4

1. General Warehouse Workers Perform Varying and Disparate Functions ..... 5

2. Distribution Centers Employ Persons in Other, Disparate Hourly Positions ..... 6

3. PPE and Other Specialized Gear Varies by Position ..... 7

B. Dollar General Rounding and Attendance Policies are Lawful ..... 8

1. No Compensable Work is Performed Pre-Shift ..... 8

a. Employees are Permitted to Clock In Up to 7 Minutes Early ..... 9

b. Meal Break Rounding Does Not Result in Failure to Compensate Employees for All Time Worked ..... 11

2. Productivity Measures and Testimony From Purported Class Members Support a Finding of No Off-The-Clock Work During Meal Breaks ..... 12

3. End-of-Shift Rounding Favors Employees ..... 12

III. ARGUMENTS AND AUTHORITIES ..... 13

A. The Legal Framework ..... 14

1. FLSA Case Law is Instructive of Plaintiff's PMWA Claims ..... 14

2. The Portal-to-Portal Act and the Continuous Workday Rule Demonstrate that Time Spent Traveling to and from the Worksite is not Compensable ..... 15

a. Pre-Shift Travel Time (Even On-Site, and Post-Clock In) is Not Compensable ..... 15

b. Bona Fide Meal Breaks (and Any Donning and Doffing/Travel Time Associated Therewith) Are Excluded from the Continuous Workday Rule and Are Not Compensable ..... 17

3. Donning and Doffing is Only Compensable if, Among Other Things, it is Required or Controlled by the Employer and "Integral and Indispensable" to an Employee's Principal Activity ..... 18

4. De Minimis Doctrine Counsels that Activities that Take Insignificant Time are Non-compensable; Do Not Trigger the Start of the Continuous Workday ..... 18

**TABLE OF CONTENTS**
(continued)

**Page**

5. Rounding is Expressly Endorsed by the DOL and the Relevant Case Law .......... 19

B. The Court Should Deny Conditional Certification of Plaintiff's FLSA Claims .......... 20

1. The Traditional Standard for Conditional Certification Used In Cases (Unlike This One) with Limited Factual Discovery .......... 20

a. A More Rigorous Stage One Standard Applies Where, As Here, the Parties Have Engaged in Substantial Discovery .......... 22

b. The Parties Have Conducted Substantial Class Certification Discovery .......... 22

2. Conditional Certification Should be Denied Because Plaintiff Has Failed to Present Substantial Allegations that Proposed Class Members were Subject to a Single Decision, Plan or Policy that Violated the FLSA .......... 23

a. There is no Common Policy or Practice Requiring Employees to Work Before the Official Start of their Shift, or After their Shift has Ended .......... 24

(1) Plaintiff has Failed to Present Evidence that Employees Engaged in Compensable Donning and Doffing, or that Any Common Donning and Doffing Practice Exists .......... 24

(a) Those Employees Who Do Use PPE/Gear Gather Such Items Pre- Shift (If at All) and do Not "Don" Until After the Start of Shifts .......... 25

(b) Even if Employees Don and Doff Equipment at their Lockers, Doing so is not "Integral and Indispensable" to the Employee's Primary Activities, and Thus is Not Compensable .......... 26

(c) Even If Employees Don and Doff Equipment at their Lockers, and the Same Could Considered "Integral and Indispensable" (which it Cannot) this Time is De Minimis .......... 26

(d) Many Proposed Class Members Do Not Don or Doff any PPE or Specialized Gear; For Others, Donning and Doffing is Not "Required or Controlled" by Dollar General .......... 27

**TABLE OF CONTENTS**
(continued)

**Page**


(i) Many Positions Require no PPE or Specialized Gear ..... 27

(ii) Donning/Doffing of Optional Equipment is Not Compensable..... 27

(iii) Some Employees Own their own Gear or Store it at Home ..... 28

(2) Dollar General has no Policy or Practice of Requiring Employees Perform Compensable Activity Before the Start of Shift, Even After Clocking In..... 28

b. Dollar General's Rounding Policy is Facially Neutral and does Not Result in Failure to Compensate Employees for all Hours Worked..... 29

(1) Dollar General's Rounding Policy is Facially Neutral..... 30

(2) Start-of-Shift Rounding Relates Only to Non-Compensable Time ..... 32

(a) Per the Portal-to-Portal Act, Travel to Worksite is Not Compensable ..... 34

(b) Compensable Work Begins at Shift Start Time, When Employees Attend Start Up Meetings or Arrive at their Worksite..... 34

(3) Employees are Relieved of Duty for at Least 30 Minutes During Each Meal Break, Regardless of "Clocked Out" Time and Thus Any Time Rounded Up to 30 Minutes is Non-compensable..... 34

(4) End-of-Shift Rounding Favors Employees; or is Not Compensable..... 36

3. The De Minimis Doctrine Counsels Against Class Certification ..... 37

4. Premature Issuance of Notice Carries Irreversible Consequences ..... 39

5. The Nonexistence of Opt-Ins Weighs Against Certification ..... 41

C. The Court Should Deny Rule 23 Certification of Plaintiff's PMWA Claim..... 42

1. Applicable Legal Standard..... 42

2. The Class is Not Ascertainable..... 43

a. There is no Uniform Policy or Practice Requiring Pre- or Post- Shift Duties Across the Class ..... 44

**TABLE OF CONTENTS**
(continued)

**Page**


b. Dollar General's Rounding Policies are Lawful and Plaintiff does not Identify an Ascertainable Class Related to this Policy .......... 46

3. Individual Issues Predominate and a Class Action is Not Superior .......... 47

4. Plaintiff Has Not Proven the Rule 23(a) Requirements are Satisfied .......... 48

a. There are No Common Answers to Common Questions .......... 48

b. Typicality and Adequacy have Not Been Established .......... 49

D. Plaintiff's Derivative Claims Should Not be Certified .......... 50

IV. CONCLUSION .......... 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adair v. Wisconsin Bell, Inc.*,
2008 WL 4224360 (E.D. Wis. Sept. 11, 2008)....29

*Alford v. Perdue Farms, Inc.*,
No. Civ. A. 5:07-CV-87CAR, 2008 WL 879413 (M.D. Ga. Mar. 28, 2008)....18

*Alonzo v. Maximus, Inc.*,
832 F. Supp. 2d 1122 (C.D. Cal. 2011)....30, 33

*In re Amazon.com, Inc., Fulfillment Ctr. Fair Labor Standards ACT (FLSA) & Wage & Hour Litig.*,
2018 WL 4148856 (W.D. Ky. Aug. 30, 2018)....15

*Anderson v. Pilgrim's Pride Corp.*,
147 F. Supp. 2d 556 (E.D. Tex. 2001), *aff'd*, 44 Fed. Appx. 652 (5th Cir. 2002)....19

*Austin v. Amazon.com, Inc.*,
2010 WL 1875811 (W.D. Wash. May 10, 2010)....30, 31

*Babcock v. Butler County*,
806 F.3d 153 (3d Cir. 2015)....17

*Bamonte v. City of Mesa*,
598 F.3d 1217 (9th Cir. 2010)....28

*Binissia v. ABM Indus., Inc.*,
No. 13 C 1230, 2014 WL 793111 (N.D. Ill. Feb. 26, 2014)....32

*Bonilla v. Baker Concrete Const., Inc.*,
487 F.3d 1340 (11th Cir. 2007)....16, 29, 30

*Bouaphakeo v. Tyson Foods, Inc.*,
564 F. Supp. 2d 870 (N.D. Iowa 2008)....22

*Briggins v. Elwood TRI, Inc.*,
882 F. Supp. 2d 1256 (N.D. Ala. 2012)....41

*Brown v. L & P Indus., LLC*,
No. 5:04CV0379JLH, 2005 WL 3503637 (E.D. Ark. Dec. 21, 2005)....30

*Bunyan v. Spectrum Brands, Inc.*,
No. 07-CV-0089-MJR, 2008 WL 2959932 (S.D. Ill. July 31, 2008)....22

Page(s)

*Burkhart-Deal v. Citifinancial, Inc.*,
No. 07-1747, 2010 WL 457127 (W.D. Pa. Feb. 4, 2010) ........ 20

*Chao v. Self Pride, Inc.*,
No. CIV.RDB 03-3409, 2005 WL 1400740 (D. Md. June 14, 2005) ........ 30

*Comcast v. Behrend*,
133 S. Ct. 1426 (2013) ........ 47

*Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*,
821 F.3d 1069 (9th Cir. 2016) ........ 19, 30

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
543 F.3d 141 (3d Cir. 2008) ........ 43

*De Asencio v. Tyson Foods, Inc.*,
500 F.3d 361 (3d Cir. 2007) ........ 15, 19

*Diaz v. Elecs. Boutique of Am., Inc.*,
No. 04-CV-0840E, 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ........ 40

*Eyles v. Uline, Inc.*,
No. 4:08-CV-577-A, 2009 WL 2868447 (N.D. Tex. Sept. 4, 2009), *aff'd*, 381 Fed. Appx. 384 (5th Cir. 2010) ........ 30

*Farris v. County of Riverside*,
667 F.Supp.2d 1151 (C.D.Cal.2009) ........ 37

*Ford-Greene v. NHS, Inc.*,
106 F. Supp. 3d 590 (E.D. Pa. 2015) ........ 15

*Fox v. Tyson Foods, Inc.*,
No. 4:99-CV-1612-VEH, 2006 WL 6012784 (N.D. Ala. Nov. 15, 2006) ........ 25

*Freeman v. Wal-Mart Stores, Inc.*,
256 F. Supp. 2d 941 (W.D. Ark. 2003) ........ 40

*Frye v. Baptist Memorial Hospital Inc.*,
No. 07-2708, 2010 WL 3862591 (W.D. Tenn. Sept. 27, 2010) ........ 41

*Gates v. Rohm & Haas Co.*,
655 F.3d 255 (3d Cir. 2011) ........ 43

*Griffin v. S & B Engineers & Constructors, Ltd.*,
507 Fed. Appx. 377 (5th Cir. 2013) ........ 16

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Guyton v. Tyson Foods, Inc.*,
767 F.3d 754 (8th Cir. 2014) ....................18

*Hassine v. Jeffes*,
846 F.2d 169 (3d Cir. 1988)....................49

*Hayes v. Wal-Mart Stores, Inc.*,
725 F.3d 349 (3d Cir. 2013)....................43, 44

*Hesseltine v. Goodyear Tire & Rubber Co.*,
391 F.Supp.2d 509 (E.D.Tex.2005)....................37

*Hickton v. Enter. Rent-A-Car Co. (In re Enter. Rent-A-Car Wage & Hour Empl. Practices Litig.)*,
2010 WL 3447783 (W.D. Pa. Aug. 13, 2010) ....................21, 22

*Hirsch v. EPL Techs., Inc.*,
2006 PA Super 293, 910 A.2d 84 (2006)....................50

*Hoffmann v. Sbarro, Inc.*,
982 F. Supp. 249 (S.D.N.Y. 1997) ....................23

*Hoffmann-La Roche Inc. v. Sperling (Hoffman-La Roche II)*,
493 U.S. 165 (1989)....................23, 40

*Holley v. Erickson Living*,
No. 11-2444, 2012 WL 1835738 (E.D. Pa. May 21, 2012)....................21

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)....................43, 47

*IBP, Inc. v. Alvarez*,
546 U.S. 21 (2005)....................15, 16

*Integrity Staffing Sols., Inc. v. Busk*,
135 S. Ct. 513 (2014)....................15, 16

*Jackson v. Se. Pennsylvania Transp. Auth.*,
260 F.R.D. 168 (E.D. Pa. 2009)....................49

*Johnson v. Big Lots Stores, Inc.*,
561 F. Supp. 2d 567 (E.D. La. 2008)....................40

*Kellar v. Summit Seating Inc.*,
664 F.3d 169 (7th Cir. 2011) ....................20

**Page(s)**

*Keller v. TD Bank, N.A.*,
No. 12-5054, 2014 WL 5591033 (E.D. Pa. Nov. 4, 2014) ....................24

*Lindow v. United States*,
738 F.2d 1057 (9th Cir.1984) ....................37

*Livi v. Hyatt Hotels Corp.*,
2017 WL 5128173 (E.D. Pa. Nov. 6, 2017) ....................14

*Lugo v. Farmer's Pride Inc. (Lugo I)*,
No. CIV.A. 07-CV-00749, 2008 WL 638237 (E.D. Pa. Mar. 7, 2008) ....................22

*Lugo v. Farmer's Pride Inc. (Lugo II)*,
737 F. Supp. 2d 291 (E.D. Pa. 2010) ....................40, 41

*Lugo v. Farmer's Pride Inc. (Lugo III)*,
802 F.Supp.2d 598 (E.D. Pa. 2011) ....................15, 17, 18, 34

*Lugo v. Farmers Pride, Inc. (Lugo State)*,
2009 PA Super 5, 967 A.2d 963 ....................24

*Lusardi v. Xerox Corp.*,
118 F.R.D. 351 (D.N.J. 1987) ....................40

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) ....................44

*Martin v. Citizens Fin. Group, Inc.*,
CIV.A. 10-260, 2013 WL 1234081 (E.D. Pa. Mar. 27, 2013) ....................23

*Mitchell v. JCG Industries, Inc.*,
745 F.3d 837 (7th Cir. 2014) ....................17

*Mitchell v. Moore*,
1999 PA Super 77, 729 A.2d 1200 (1999) ....................50

*Myers v. Jani-King of Philadelphia, Inc.*,
No. 09- 1738, 2015 WL 1055700 (E.D. Pa. Mar. 10, 2015) ....................43

*Naylor v. Securiguard, Inc.*,
801 F.3d 501 (5th Cir. 2015) ....................17

*Perez v. Mountaire Farms, Inc.*,
650 F.3d 350 (4th Cir. 2011) ....................15, 17, 18

*Philadelphia Metal Trades Council v. Konnerud Consulting W., A.S.*,
2016 WL 1086709 (E.D. Pa. Mar. 21, 2016) ....................15

## TABLE OF AUTHORITIES
(continued)


**Page(s)**

*Pryor v. Aerotek Sci., LLC*,
278 F.R.D. 516 (C.D. Cal. 2011) .......... 3

*Razak v. Uber Techs., Inc.*,
2016 WL 5874822 (E.D. Pa. Oct. 7, 2016) .......... 15

*Schneider v. Union Hosp., Inc.*,
2016 WL 524354 (S.D. Ind. Feb. 10, 2016) .......... 30

*Sepulveda v. Allen Family Foods, Inc.*,
591 F.3d 209 (4th Cir. 2009) .......... 17

*In re Shering Plough Corp. ERISA Litig.*,
589 F.3d 585 (3d Cir. 2009) .......... 49

*Sloan v. Renzenberger, Inc.*,
No. 10–2508–CM–JPO, 2011 WL 1457368 (D. Kan. Apr. 15, 2011) .......... 30

*Smith v. Aztec Well Servicing Co.*,
462 F.3d 1274 (10th Cir. 2006) .......... 16

*Sperling v. Hoffman La-Roche, Inc.* (*Hoffman-La Roche I*),
862 F.2d 439 (3d.Cir. 1988) *aff'd and remanded sub nom. Hoffmann-La Roche Inc. v. Sperling (Hoffman-La Roche II)*, 493 U.S. 165 (1989) .......... 20

*Thiessen v. General Elec. Capital Corp*,
996 F. Supp. 1071 (D. Kan. 1998) .......... 22

*Utne v. Home Depot U.S.A., Inc.*,
2017 WL 5991863 (N.D. Cal. Dec. 4, 2017) .......... 30

*Verma v. 3001 Castor, Inc.*,
CV 13-3034, 2016 WL 6962522 (E.D. Pa. Nov. 29, 2016) .......... 43

*Villanueva-Bazaldua v. TruGreen Ltd. Partners*,
479 F. Supp. 2d 411 (D. Del. 2007) .......... 22

*Von Friewalde v. Boeing Aerospace Operations, Inc.*,
339 Fed. Appx. 448 (5th Cir. 2009) .......... 16

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) .......... 42, 43, 48

*Weil v. Metal Techs., Inc.*,
260 F. Supp. 3d 1002 (S.D. Ind. 2017) .......... 20

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Wright v. Lehigh Valley Hosp. & Health Network*,
No. 10-431, 2011 WL 221770 (E.D. Pa. Jan. 20, 2011) .......... 20, 21

**Statutes**

43 P.S. §260.3 .......... 13

43 P.S. § 333.104(a) .......... 14

29 U.S.C. § 203(g) .......... 14

29 U.S.C. § 216(b) .......... 13, 20, 42

**Other Authorities**

29 C.F.R. § 785.34 .......... 16, 46

29 C.F.R. § 785.48 .......... 19, 20, 29, 33, 46

29 C.F.R. § 790.7(g) .......... 16, 46

29 C.F.R. § 9785.47 .......... 18

34 Pa. Code § 231.1 .......... 14

Fed. R. Civ. P. 12(b)(6) .......... 30, 31

Fed. R. Civ. P. 23 .......... *passim*

## I. INTRODUCTION

Plaintiff Christopher Weller ("Weller"), who is both the sole named and opt-in Plaintiff in this putative collective/class action,[1] has asked the court to conditionally certify a nationwide class under Rule 216 of the Fair Labor Standards Act ("FLSA") (the "Collective Action Class") for alleged overtime violations, and to certify a state-wide class under Rule 23(b) (the "Rule 23 Class") regarding alleged Pennsylvania Minimum Wage Act ("PMWA") violations, among other claims. Weller claims that Defendant Dolgencorp, LLC ("Dollar General")[2] has uniform time punch and pay rounding policies that deprive hourly employees of compensable work time at 15 distribution centers (herein, "DCs") nationwide. He also claims that all hourly DC employees are required to keep personal protective equipment ("PPE") and other specialized gear in a personal locker, which they allegedly don (but, in reality, only gather) before clocking in and return after clocking out.

To support his request for certification, Plaintiff relies solely on his own self-serving, non-representative testimony and a pseudo-statistical analysis of time-punch and rounding pay data which incorrectly equates clock-in time with compensable time.[3] This theory is simply not supported by law or the evidence in this case. Clock-in data and rounded time pay data do not (and cannot) provide a common answer to how (and if) Dollar General's rounding practice legally impacts the putative class. Such answers can only be resolved by asking each class member whether they engage in compensable activities before the start of their shifts, during their meal breaks, or after their work shifts end.

---

[1]Plaintiff testified that he has contacted potential class members about joining this suit and put them in touch with his attorneys. Ex. 1(G), Weller Dep. 27:6 – 31:13.

[2]Dolgencorp, LLC was Plaintiff's employer and, thus, is the proper party Defendant in this case. Dollar General Corporation never employed Plaintiff. Dollar General Corporation denies that this Court has jurisdiction over it related to Plaintiff's claims. However, to the extent it is deemed an appropriate party to this suit, or to the extent necessary and appropriate, it adopts all of Dolgencorp, LLC's arguments and defenses as set forth herein and in the future.

[3] Plaintiff's expert, Dr. Crawford, has admitted that he does not know the legal standards regarding compensable time and cannot opine on whether Dollar General's rounding policies resulted in a loss of *compensable* time. Ex. 1(I), Crawford Dep. 25:13-20; 27:7-13; *see* p. 3, FN 12, *infra*.

Discovery has shown that Weller's alleged pre- and post- shift activities are unique not only to his experience as a Picker (and later, as a Putaway Driver) at the Bethel DC (defined *infra*), which required different equipment than all other positions, but also to *personal choices made by him* regarding when to arrive at work, when to punch into the timekeeping system, whether to perform work duties either pre- or post- punch, and where to store and don simple protective gear used to perform his job duties. Dollar General's DC workforce consists of a diverse range of positions to perform varied tasks across five different departments using different equipment.[4] Weller cannot show that he is representative of all other employees in either the Bethel DC or the other 14 DCs that he has never visited or in which he has never worked. For example:

- No single item of PPE is uniform across all positions;[5]
- Some employees retrieve PPE from lockers, while others have no lockers at all or do not make use of the lockers provided to them;[6]
- Some visit their lockers *after* clocking in rather than before;[7]
- Some positions attend a shift kick-off meeting (called a "Start Up Meeting" or "SUM"), while others start their shift without attending a SUM;[8]
- Some employees work close to their lockers and the time clock, while others must walk some distance before beginning compensable work;[9] and
- Some employees drive mobile operating equipment, while others do not.[10]

Ignoring these differences, Weller argues that he is representative of the proposed class members because all employees were subject the same timekeeping policies, i.e., because time punches are rounded, all employees are similarly situated. However, the question is not, "what are the common timekeeping policies?" but rather, "as applied to employees' work-related tasks and pre- and post- shift activities, do those common timekeeping policies result in systemic failure to

[4]*See* discussion of Dollar General's DC operations at Statement of Facts ("SOF"), Section II.A, *infra*.
[5] *See* SOF, Section II.A.3, *infra*; *see also* Ex. 1(D), Summary Chart D (summarizing GWW's use of PPE/gear).
[6] *See* SOF, Section II.A.3, *infra*.
[7] *See* SOF, Section II.A, *infra* at FN 21.
[8] *See* SOF, Section II.A.2, *infra*.
[9] *See* SOF, Section II.A, *infra* at FN 19.
[10] *See* Section III.B.2.a.2, *infra* at FN 134.

pay employees for all time worked, ***and can that question be answered with common proof***?"[11] The answer to these questions is clearly "no." As more fully discussed below, a determination of potential liability in this case would require individualized factual proof as to, among other things, the duties of each purported class member, his required PPE, gear, or equipment (if any), and, most importantly, his pre- and post- shift activities (including whether his/her department has a SUM, whether he/she stores any PPE, his/her clock in/out practices, etc.).

In short, there is no policy or collection of policies that uniformly and negatively impact Dollar General's DC workforce, or any identifiable segment thereof. Rather, Dollar General's facially-neutral rounding practice is lawful, both in design and implementation, as it does not result in a failure to pay employees for compensable time. Even if, for argument's purposes, Plaintiff's pseudo-statistical "expert" report is accepted as factually correct, it proves only that employees are compensated for less time than they are clocked in, *not* that they are compensated for less time than they actually worked.[12] Plaintiff's expert readily conceded this point and expressed no opinion as to whether the time between clocking in and the start of shift was "compensable" time. Plaintiff has not produced evidence, beyond his own testimony, that *other* employees in either his own DC or the 14 others across the nation performed pre- or post- shift work for which they have not been

---

[11] *Pryor v. Aerotek Sci., LLC*, 278 F.R.D. 516, 532 (C.D. Cal. 2011) ("[W]hile the policies about which Pryor complains are common, how those policies affect members of the class depends on the individual circumstances of each Aerotek employee. Once the factfinder determines what Aerotek's policies are, that does not answer the ultimate question in the case—whether Aerotek's time reporting policies resulted in the undercompensation of and failure to pay overtime to putative class members.")

[12] Plaintiff's expert compared clock-in clock-out records with rounded time data to conclude that, as a whole, Dollar General's rounding policy results in a net loss of time. *See, generally,* Expert Report of David L. Crawford, Ph.D., attached as Ex. A to the Motion. Dr. Crawford also analyzed meal break times to conclude that a sample of employees clocked in after less than 30 minutes yet had 30 minutes of non-compensable break time deducted from their work day. Nothing in his report, however, addresses whether employees were *actually performing compensable work* in the time he concludes was rounded away. *See* Ex. 1(I), Crawford Dep. 25:13-20 ("I'm not opining about what's compensable and what isn't compensable."); 27:7-13; 46:3-47:2. Rather, the whole of his analysis is limited to a comparison of clock-in clock-out records and employees rounded time, a fact he readily admitted at his deposition. *Id.* at 10:13 – 11:5. Dr. Crawford admits that his analysis shows only that, on the whole, clocked in time is greater than rounded time. *Id.* at 62:8 – 63:12; 66:2-11; 68:1-6; 69:5-9. He further admitted, as discussed *infra*, that end-of-shift rounding (even according to his limited analysis) works in favor of the employee. *Id.* 101:22-102:9.

compensated. After over a year of litigation, Plaintiff did not attach a single declaration from a proposed class member that would establish that even one other employee makes such allegations.

Because Weller has failed to demonstrate that he is similarly situated to other members of his proposed Collective Action Class ***and*** because there is no common, unlawful policy affecting the proposed class members, conditional certification must be denied. Likewise, certification of Plaintiff's Rule 23 Class should be denied (under a more stringent standard) on ascertainability, commonality and typicality grounds.

## II. STATEMENT OF FACTS

### A. Dollar General's Distribution Centers

Dollar General is a discount retailer of consumable goods with around 15,000 retail locations nationwide.[13] As a general rule, retail locations are supplied by Defendant's DCs, including the Bethel, Pennsylvania DC where Plaintiff worked (the "Bethel DC").[14] DCs are responsible for receiving product and allocating and sending it to specific stores.[15]

The Bethel DC is approximately one million square feet in size and employs over 500 hourly employees.[16] Near the building entrance and on the second floor is a set of lockers and the employee break room,[17] and a flight of stairs down leads to a row of time clocks, where employees clock in before walking to their workstations in various departments.[18] Depending on their employment position, employees may have a short walk from the time clock, or a longer one.[19] As shown on the attached diagram,[20] the Bethel DC contains numerous rows of stored merchandise,

[13]Ex. 1(H), Massey Dep. 29:4-6.
[14]*See* Ex. 1(H), Massey Dep. 26:23 – 28:19.
[15]Ex. 1(H), Massey Dep. 26:23 – 28:16; 34:15-23.
[16] Ex. 21, Zappacosta Decl. ¶¶ 5, 6 (one million square feet; employing over 500 hourly employees).
[17]Ex. 1(H), Massey Dep. 111:20 – 112:12; Ex. 1(G), Weller Dep. 139:12-24.
[18]*See* Ex. 1(G), Weller Dep. 139:12-24; Ex. 1(H), Massey Dep. 111:20 – 113:11.
[19] *Compare* Ex. 11, Mehler Decl. ¶8 (30 second walk from time clock to equipment room, where his SUM takes place) *with* Ex. 9, S. Kreiser Decl. ¶5 (4-5 minute walk to SUM); *see also* Ex. 1(B), Summary Chart B, Column A.
[20]*See* Ex. 1(G), Weller Dep. 86:17 – 90:11 and Ex. 14 thereto.

with inbound "Receiving" docks on one side, and outbound "Shipping" docks on the other. There are also designated areas for various departments. Maintenance workers have a second set of lockers located within the Maintenance department, which are on the other side of the time clocks and accessed only after clocking in.[21] Different DCs have different layouts.[22]

### 1. General Warehouse Workers Perform Varying and Disparate Functions

Many hourly employees working at the Bethel DC fall in the category of "General Warehouse Workers" ("GWWs").[23] GWWs have varying responsibilities and are assigned and perform many different and discrete functions, which can and often do vary day-to-day.[24] In the Receiving Department, "Checkers" check in products from vendors[25] and "Putaway Reach Operators" (also called "Put-Away Drivers," "Lift Drivers" or "Lift Operators") transport that merchandise to where it will be stored in the warehouse.[26] In the Full-Case Department, "Full-Pallet Replenishment Drivers" are charged with keeping the "pick areas" fully stocked with pallets of merchandise,[27] so that "Full-Case Pickers" are able to fill orders with cases from the pick area.[28]

In the Repack Department, full cases of merchandise – brought to the repack area by "Partial-Pallet Replenishment Drivers" (also called "MUOP Drivers")[29] – are broken down into single items or packs,[30] after which they are stocked in the appropriate location within the Repack area by "Stockers."[31] These items are retrieved by "Repack Pickers," who fill orders of smaller quantities of merchandise than their Full-Case Picker peers (who pick full cases), usually by hand

---

[21]Ex. 3, Dengler Decl. ¶8.
[22]Ex. 1(H), Massey Dep. 108:23 – 110:17; 169:5 – 170:7 (older, non-"GEN-3" DCs utilize conveyors and thus less mobile operating equipment like rolltainer carriers).
[23]Ex. 1(H), Massey Dep. 36:24 – 37:8.
[24]Ex. 1(G), Weller Dep. 149:8-16.
[25]Ex. 1(H), Massey Dep. 120:7-20; 130:11-13; Ex. 1(G), Weller Dep. 99:10-20.
[26]Ex. 1(G), Weller Dep. 121:16-23.
[27]Ex. 1(G), Weller Dep. 108:22 – 109:2.
[28]Ex. 1(G), Weller Dep. 119:17 – 121:4.
[29]Ex. 1(G), Weller Dep. 114:22 – 115:9.
[30]Ex. 1(G), Weller Dep. 93:19 – 94:1.
[31]Ex. 1(H), Massey Dep. 120:24 – 121:5; Ex. 1(G), Weller Dep. 100:14-20.

and without the use of heavy equipment.[32] In Gen-3 DCs like Bethel[33] – which has a 4-story Repack area – after the Repack Pickers have filled a container of merchandise (called a "tote") and zip tied it shut, the tote is placed on a conveyor where it travels on a loop to the Shipping Department.[34] There, "Loop Operators" are responsible for ensuring the loop is functioning properly and for removing totes and stacking them until orders can be loaded for delivery.[35]

Also in the Shipping Department are "Loaders" who load out-bound trailers with merchandise designated to be delivered to a specific store[36] and "Yard Drivers" who move trailers in and out of dock doors as necessary.[37] Merchandise is transported for delivery in rolltainers—large, screened carts in which merchandise is stacked.[38] Once a rolltainer is unloaded at the store, it is returned to the warehouse empty, where "Cyclers" remove it from the trailer.[39] The returning rolltainers are also inspected to make sure they remain in proper working condition, and if they have become damaged, an hourly Rolltainer Repair Technician, a General Warehouse Worker, will repair them before they are cycled back into service.[40]

**2. Distribution Centers Employ Persons in Other, Disparate Hourly Positions**

In addition to GWWs who perform the many jobs noted above, the Bethel DC employs hourly employees in a number of support functions:[41] Human Resources has "Human Resource Assistants;" Inventory Control has "Cycle Counters;" Warehouse Management Systems ("WMS") has "WMS Clerks;" and Maintenance has "Maintenance Mechanics."[42] Certain hourly

---

[32]Ex. 1(H), Massey Dep. 125:25 – 126:6; *see also* Ex. 1(G), Weller Dep. 94:2-15.
[33]Ex. 1(H), Massey Dep. 109:4 – 110:17 (5 of the 15 DCs, including the Bethel DC, are considered "Gen-3"; the remaining DCs have different layouts.)
[34]Ex. 1(H), Massey Dep. 166:2-12.
[35]Ex. 1(H), Massey Dep. 166:2-22.
[36]Ex. 1(H), Massey Dep. 127:24 – 128:3.
[37]Ex. 1(H), Massey Dep. 166:24 – 167:3.
[38]Ex. 1(H), Massey Dep. 127:12 – 20; *see also* Ex. 16, Shaud Decl. ¶4.
[39]Ex. 1(H), Massey Dep. 167:17 – 168:1.
[40]Ex. 16, Shaud Decl. ¶4.
[41]Ex. 1(H), Massey Dep. 36:10-23.
[42]Ex. 1(H), Massey Dep. 38:2-13.

administrative employees do not belong to any particular department (*i.e.,* "Shipping Clerks," "Receiving Clerks," and Sanitation Workers).[43] Except for certain Maintenance workers, these positions are mainly clerical and do not involve the use of heavy equipment or PPE/specialized gear.[44] Most of these positions have no daily SUM and instead begin their day in their work area.[45]

**3. PPE and Other Specialized Gear Varies by Position**

Certain hourly employees use PPE or other specialized gear/equipment, but others do not,[46] and it varies between job assignments and, sometimes, from day-to-day. For example, Checkers - who check in delivered merchandise– use no PPE at all;[47] Putaway Reach Operators and Full-Pallet Replenishment Drivers wear safety glasses (unless the employee wears prescription glasses, in which case separate safety glasses are not required);[48] Repack Pickers wear a headset and belt, and have the option of using an apron or gloves;[49] Stockers wear a glove and a protective arm sleeve;[50] MUOP Drivers wear a safety harness and safety glasses;[51] and Yard Drivers wear a fluorescent shirt *or* yellow vest, and have the option of wearing a raincoat.[52] Some PPE is optional or is only occasionally used, such as when performing a certain task.[53]

Dollar General has no uniform policy requiring employees to store PPE/gear in lockers.[54]

---

[43]Ex. 1(H), Massey Dep. 38:2-20.
[44]*See*, e.g., Ex. 6, Hare Decl. ¶6 (mostly works on computer/phone); Ex. 14, Nelson Decl. ¶11 (works at computer).
[45] Ex. 3, Dengler Decl. ¶11; Ex. 6, Hare Decl. ¶¶3, 12; Ex. 14, Nelson Decl. ¶¶3, 12; Ex. 16, Shaud Decl. ¶11.
[46]Ex. 1(D), Summary Chart D (summarizing GWW's use of PPE/gear); *see also* Ex. 3, Dengler Decl. ¶5 (no PPE as Rolltainer Repair Technician); Ex. 6, Hare Decl. ¶6 (no PPE as WMS Clerk); Ex. 14, Nelson Decl. ¶17.
[47]Ex. 4, Fusselman Decl. ¶¶5-6; Ex. 9, S. Kreiser Decl. ¶¶3, 8.
[48]Ex. 4, Fusselman Decl. ¶12; Ex. 10, Mast Decl. ¶¶12-13.
[49]Ex. 7, Harris Decl. ¶14; Ex. 12 Mingucha Decl. ¶¶ 5-6; Ex. 18, Delgado Decl. ¶¶7-9.
[50]Ex. 4, Fusselman Decl. ¶15; Ex. 7, Harris Decl. ¶5; Ex. 19, Ferguson Decl. ¶15.
[51]Ex. 3, Dengler Decl. ¶7; Ex. 4, Fusselman Decl. ¶14; Ex. 10, Mast Decl. ¶4; Ex. 19, Ferguson Decl. ¶19.
[52]Ex. 8, R. Kreiser Decl. ¶¶3, 6-10.
[53]Ex. 17, Telford Decl. ¶14 (disposable mask used for specific projects only, and put on right before use); Ex. 14, Nelson Decl. ¶7 (reflective vest occasionally worn); Ex. 3, Dengler Decl. ¶9 (equipment use depends on task).
[54]Ex. 1(H), Massey Dep. 112:2-7 ("If the employee chooses to use it there are employee lockers available[.]"); 131:10-18 ("[T]he locker is provided if the employee wishes to use that space for their storage."); *see also*, Ex. 1 to the Motion, Defendant Dolgencorp, LLC's Amended and Supplemental Responses to Plaintiff's First Set of Interrogatories, at 26 (employees may choose to store equipment "in personal locker[s] provided by Dollar General for their convenience.").

While some employees use their lockers, others do not.[55] Others choose to have no locker at all.[56] Employees are generally (but not always)[57] expected to have PPE/gear in-hand when they arrive at the start of their shift.[58] Employees have the option of taking PPE/gear home – and some do.[59]

## B. Dollar General Rounding and Attendance Policies are Lawful

Hourly DC employees record their time in the Kronos system.[60] In Kronos, clock-in times at the beginning of an employee's shift are rounded up or down to the nearest quarter hour.[61] Similarly, day-end clock-out times are rounded up or down to the nearest quarter hour. *Id.* Clock-in and clock-out times for meal breaks are not separately rounded; instead, the total time an employee is clocked out for a meal break is rounded to the nearest quarter hour. *Id.* The rounded meal break time is then subtracted from the total time between the initial clock-in time, as rounded, and the final clock-out time, as rounded, to arrive at the total punched time for the day.[62]

### 1. No Compensable Work is Performed Pre-Shift

GWWs' shifts begin on the hour or the half hour, and employees typically clock-in no earlier than 7 minutes prior to the start of their work day.[63] Thus, an employee's first clock-in time is typically rounded to the start of his shift, which marks the beginning of his workday and the start of any compensable time. As discussed in detail below, employees are not *required or expected* to clock-in 7 minutes early. However, employees are expected to be at their workstation

[55]Ex. 9, S. Kreiser Decl. ¶4 (never uses locker).
[56]Ex. 8, R. Kreiser Decl. ¶13; Ex. 14, Nelson Decl. ¶10.
[57]Not all employees arrive for their start of shift with their PPE or gear. Sanitation worker Gabriel Telford testified that he never retrieves his equipment from his locker prior to the start of shift, but after. Ex. 17, Telford Decl. ¶¶8-9.
[58]*See, e.g.,* Ex. 1(H), Massey Dep. 130:18-131:4.
[59]*See, e.g.*, Ex. 7, Harris Decl. ¶5 (sometimes takes gear home to be washed); Ex. 12, Mingucha Decl. ¶5 (could take belt home if he wanted to); Ex. 11, Mehler Decl. ¶4 (can take safety glasses home if he wants to, but keeps them in locker for convenience); Ex. 5, Garcia ¶9 (can take safety glasses home, but keeps in locker so he doesn't forget them).
[60]Ex. 1(H), Massey Dep. 38:21 – 39:9.
[61]Ex. 1(H), Massey Dep. 39:11-22.
[62]Due to state law considerations, Dollar General's California DC does not round employees' meal breaks. (Ex. 1(H), Massey Dep. 40:4-23.)
[63]*See* Exs. 8-10, 12 to the Motion; *see also* Ex. 1(H), Massey Dep. 70:8-19 (no earlier than 7 minutes is "best practice").

or daily SUM at the time their shift is scheduled to start. Accordingly, employees may choose to clock-in a few minutes early to allow for travel time from the time clock to their work station to ensure they arrive by the start of their shift.[64] Employees who work closer to the time clocks may necessarily choose to allow less time for travel than those who work farther away.[65] Pre-shift, clocked-in time is not spent working, but rather is spent on traveling to workstations or engaging in other non-work activities. *Id.* Contrary to Weller's allegations, SUMs do not begin prior to an employee's scheduled start time,[66] nor do employees begin performing their assigned job functions prior to the start of their shifts.[67] Indeed, not all hourly associates even attend a SUM (*i.e.*, Maintenance Technicians, WMS Clerks and Sanitation workers are among those who do not).[68]

**a. Employees are *Permitted* to Clock In *Up to* 7 Minutes Early**

Despite Plaintiff's attempt to manufacture one, there is no policy that *requires* employees to clock in *exactly* 7 minutes before the start of their shift. Rather, employees are *permitted* to clock-in *up to* 7 minutes early – but may also clock in 6, 5, 4, 3, 2, or 1 minute(s) early, or exactly on time – as desired or to the extent necessary to reach their work station by their scheduled start time.[69] Dollar General's timekeeping system, Kronos, does not preclude employees from clocking in more than 7 minutes prior to the start of their shifts, and when employees *do* clock in more than 7 minutes early, their clock in times are rounded to the quarter hour.[70] Dollar General's Employee Handbook and training materials make this clear, repeatedly stating that employees are expected

---

[64] *See* Exs. 8, 9 & 10 to the Motion, p. 2 ("Employees should clock in no earlier than seven (7) minutes prior to their starting time, while still allowing themselves enough time to be at their work stations by their scheduled start time."); *see also* Ex. 1(H), Massey Dep. 130:18-131:4.
[65] *See* Ex. 1(B), Summary Chart B, Column A (summarizing testimony re pre-shift travel times to their workstations).
[66] *See* Ex. 1(B), Summary Chart B, Column C; Ex. 19, Ferguson Decl. ¶5; Ex. 18, Delgado Decl. ¶¶5-6.
[67] *See* Ex. 1(B), Summary Chart B, Column B.
[68] Ex. 3, Dengler Decl. ¶11; Ex. 6, Hare Decl. ¶¶3, 12; Ex. 14, Nelson Decl. ¶¶3, 12; Ex. 16, Shaud Decl. ¶11.
[69] *See* Exs. 8, 9 & 10 to the Motion, p. 2 ("Employees should clock in no earlier than seven (7) minutes prior to their starting time, while still allowing themselves enough time to be at their work stations by their scheduled start time.")
[70] *See* Ex. 20, Cullins Decl. ¶¶ 11-13 (*i.e.*, clocking in 8 minutes before start of shift rounds back to prior quarter hour).

to clock-in *no earlier than* 7 minutes prior to start time and clock out *no later than* 7 minutes after their to end time,[71] but contain no rule *mandating* (or even suggesting) that clock-ins must occur *exactly* 7 minutes prior to an employee's shift. Dollar General's Employee Handbooks state:

> Employees should clock in *no earlier than* seven (7) minutes prior to their starting time...Likewise, employees should clock out *no later than* seven (7) minutes past the end of their work time unless overtime has been authorized.[72]

Bethel DC hourly employees are required to acknowledge receipt of each of the Handbooks,[73] and this instruction is repeated throughout training materials.[74] Hourly employees understand the company's expectation is that employees arrive to their workstations on time and should clock in accordingly (but not that they have to clock in exactly 7 minutes early).[75] Plaintiff's own summary of the sample records produced by Dollar General (the "Sample")[76] clearly confirms this understanding and practice.[77] Plaintiff's expert concedes that his analysis suggests that there was no policy requiring employees to clock in *exactly* 7 minutes early, and that the data is more consistent with a practice of allowing employees to clock in *within* 7 minutes of the start of shift.[78] Weller admitted that "I mean, we didn't fully have to be there seven minutes prior."[79]

Ignoring the plethora of evidence that employees were not required to clock in exactly 7 minutes early, Weller hangs his hat on what any reasonable person would understand to be a typo

---

[71]*See* Exs. 8, 9 & 10 (2013, 2014, & 2015 Handbook Supplements), and Ex. 12 (training PowerPoint) to the Motion.
[72]*See* Exs. 8, 9 & 10 to the Motion, at p. 2 (2013, 2014, and 2015 Handbook Supplements).
[73] *See e.g.,* Ex. 1(G), Weller Dep. 63:9 – 64:10, and Ex. 10 thereto (Weller's signed acknowledgements of receipt of Handbooks and Supplements); Ex. 1(H), Massey Dep. 58:1-23; Motion Exs. 8, 9, & 10 (Handbook Supplements).
[74] *See, e.g.*, Ex. 12 to the Motion, Bethel Training Power Point, at DG-WELLER-00167 ("- Clock/Swipe in no earlier than 7 minutes **prior** to starting time.").
[75] Dollar General's declarants confirm that there is no policy or practice of clocking in exactly 7 minutes early. *See* Ex. 1(C), Summary Chart C, Columns A, B; Ex. 5, Garcia Decl. ¶6; Ex. 13, Murry Decl. ¶5; Ex. 9, S. Kreiser Decl. ¶9; Ex. 11, Mehler Decl. ¶7; and Ex. 6, Hare Decl. ¶11.
[76]The Sample consists of *all* clock-in and clock-out records for 73 employees from January 1, 2014 to December 12, 2017. The 73 individuals in the Sample were picked by Plaintiff's expert from a larger list of employee ID numbers.
[77]*See* Motion, p. 14 (Plaintiff's summary of Sample evidence, demonstrating that 63.7% of the sampled shifts have clock in times other than 7 minutes before the start of shifts).
[78]Ex. 1(I), Crawford Dep. 128:5 – 130:24.
[79] Ex. 1(G), Weller Dep. 166:12-23.

in a *supervisor* training document[80]— a document of limited, if any, applicability to the Bethel DC and upon which no Bethel hourly employee relied in determining when to clock in/out[81]—and one misconstrued line of an orientation presentation.[82] Weller's attempted reliance on two obscure and incorrect references to 7-minute guidance do not create a "policy" upon which a class can be certified. His arguments conflict with the overall weight of the evidence, and are easily dismissed.

**b. Meal Break Rounding Does Not Result in Failure to Compensate Employees for All Time Worked**

Dollar General provides its DC employees with an uninterrupted, duty-free 30 minute meal

---

[80]A document entitled "Handbook Quiz and Answers" (herein, the "Quiz") was a tool that was, at times, used by trainers in (at least) the Bessemer DC to help train Supervisors on the Employee Handbook. This Quiz contains a typo (upon which Plaintiff seeks to hang his entire case). Namely, the "Answer Key" (not given to the trainees (*see* Ex. 22, Shockley Decl. ¶ 7)) to the Handbook Quiz states that "**7&7**" is the answer to the question:

> "Employees should sign-in ***no later* than __ minutes prior to the beginning of their scheduled shift** and sign out ***no later* than __ minutes after the end of their scheduled shift** unless overtime has been authorized by their manager."

*See* Ex. 13 to the Motion, Handbook Quiz, at Question 15 (emphasis added). That the first "no later than" is a mistake (and should be "no earlier") is apparent for these reasons: First, the Quiz was designed to test trainees' knowledge of directives ***contained in the Handbooks***. *See* Ex. 22, Shockley Decl. ¶¶10-13; *see also* Exs. 8, 9 & 10 to the Motion, Handbook Supplement, at 2. Second, a mistake is the only logical conclusion to be drawn from the fact that both statements end with the qualification "unless overtime has been authorized." In other words, if it was Dollar General's directive that employees *must* clock in "no later" than 7 minutes before the start of their shift, it makes little sense that such a directive would apply "unless overtime" were authorized (as compliance with such a directive would cause the employee to be on-the-clock for *more* time, not less, and thus would mandate overtime). On the other hand, the exception for authorized overtime makes perfect sense when the language is correctly read as stating employees should clock in *no earlier than* 7 minutes prior to the start of shift (as clearly articulated in each version of the Handbook). *Id.* Even so, "no later than" does not mean "exactly at 7 minutes" either, as Plaintiff attempts to argue. In fact, in Plaintiff's unpersuasive attempt to manufacture a policy that does not exist is to juxtapose the accurate statement of the policy (no earlier than) and the inaccurate statement of the policy (no later than) to conclude that the policy is, instead *neither*, but necessarily "exactly 7 minutes" before the start of shift–a total fiction.

[81] The only relationship of this 2013 Quiz to the Bethel facility known to the person in charge of training at Bethel from 2013 to June of 2017 is that some of the first Bethel Supervisors were trained *in Bessemer* before Bethel was operating, and this Quiz was used in such Bessemer training sessions. *See* Ex. 22, Shockley Decl. ¶¶5-8. Moreover, even if used, the trainees were not given the Answer Key, and the Quiz was discussed in a group setting and explained to be consistent with the Handbook. *Id.* at ¶7. The "no later than" language in the first phrase of Question 15 is a typo, is inconsistent with the Handbook and how Trainers trained Supervisors, was never used to train any hourly employees in Bethel (*Id.* at ¶¶12-14), and was not used in Bethel once it began operations. *Id.* at ¶8; *see also* Ex. 21, Zappacosta Decl. at ¶7, Ex. 21(A) & 21(B) (confirming Quiz was not used in Bethel training sessions from 2017 to now).

[82] Plaintiff attempts to interpret the following excerpt of an orientation Power Point to be a statement of a "policy" of requiring employees to clock in at *exactly* 7 minutes before the start of a shift: "PRO TIP: - 7 minutes = Good Swipes – Clock/Swipe in no earlier or later than 7 minutes." The logical conclusion to be drawn from this PowerPoint is that it references daily swipes (hence the plural "Good Swipes") – at the beginning of the shift (no earlier than) and the end of the shift (no later than) 7 minutes, which is entirely consistent with the Handbook directives. Logic dictates that this statement be interpreted in-line with the numerous other statements that instruct employees to clock-in no earlier than 7 minutes prior to the start of her shift and no later than 7 minutes after it ends.

break.[83] Employees, however, are expected to return to their work areas in a timely manner following meal breaks. Thus, an employee may clock-in a few minutes early to arrive back to her workstation within the allotted time.[84] Employees do not perform work duties on their trips to and from the time clock, and thus even an employee who is clocked out fewer than 30 minutes during her meal break has been relieved from her actual work duties for more than that amount of time.[85] Further, contrary to Plaintiff's contentions, employees are not routinely and uniformly disciplined in the event they are clocked out for more than 30 minutes for a meal break.[86] Bethel has plenty of employees who are technically late in returning from lunch and who have not been written up or disciplined[87]—demonstrating that meal break rounding readily occurs in both directions.[88]

**2. Productivity Measures and Testimony From Purported Class Members Support a Finding of No Off-The-Clock Work During Meal Breaks**

As discussed in Plaintiff's Motion[89], Dollar General utilizes a Labor Management System ("LMS") to measure the productivity in certain hourly positions. Although it does not capture every aspect of compensable time, LMS data (compared to clocked out time in Kronos) supports a finding that employees are relieved from performing their measured job duties for 30 or more minutes around meal breaks, even when the amount of time that an employee is clocked out for a meal break is less than 30 minutes, and purported class member confirm the same.[90]

**3. End-of-Shift Rounding Favors Employees**

End of shift times are not uniform for most workers at the Bethel DC. Instead, employees

---

[83]Ex. 1(H), Massey Dep. 151:14 – 152:20; *see also* Ex. 1(A), Summary Chart A, Column A.
[84]Ex. 1(A), Summary Chart A, Column B.
[85]Ex. 1(A), Summary Chart A, Columns A, C; *see also* SOF, Section II.B.2, *infra.*
[86]Ex. 6, Hare Decl. ¶13; Ex. 12, Mingucha Decl. ¶16; Ex. 15, Rivera-Vega Decl. ¶10; Ex. 16, Shaud Decl. ¶13.
[87] *Compare* Ex. 2, Expert Report of David Lamoreaux, Ph.D., p. 5 (examples of employee meal break clock out times between 31- 37 minutes) *with* Ex. 21, Zappacosta Decl. ¶3 (noting these same employees were not disciplined).
[88]Ex. 2, Expert Report of David Lamoreaux, Ph.D., p. 5; *see also* Ex. 21, Zappacosta Decl. ¶¶3-4.
[89]The "Motion" refers to Plaintiff's Motion for Class Certification and Conditional Collective Action Certification.
[90]*See* Section III.B.2.b.3, *infra (discussing* Ex. 20, Cullins Decl.); *see also* Ex. 1(A), Summary Chart A, Columns A and B (declarants relieved > 30 minutes and any early clock-ins due to travel time).

work "to completion"—that is, until the day's assignments are completed.[91] Thus, the practice of requiring employees to clock out within 7 minutes of the end of their shift is equally likely to result in rounding favoring the employee (and compensating for non-compensable time) as it is in rounding favoring Dollar General. For example, an employee whose shift ends at 5:02 and who clocks out 7 minutes later at 5:09 will have his time rounded *forward* to 5:15, resulting in compensation for an additional 6 otherwise non-compensable minutes after clocking out. Both parties' experts confirm that end-of-shift rounding generally "increases measured worktime" favoring employees,[92] and collectively, no time (much less compensable time) is rounded away.

## III. ARGUMENTS AND AUTHORITIES

Plaintiff seeks to certify two classes. Plaintiff defines the proposed Collective Action Class under the FLSA § 216(b) as:

> All persons who have worked as a non-exempt, hourly employee at any of Defendant's distribution centers, during any workweek from May 18, 2014 to the present (the "**Collective Action Class**.")[93]

Plaintiff's proposed Rule 23 Class definition is:

> All persons who have worked as a non-exempt, hourly employee at Defendant's Bethel, Pennsylvania distribution center, during any workweek from May 18, 2013 to the present (the "**Rule 23 Class**.")[94]

For the Rule 23 Class, Plaintiff seeks certification of his Pennsylvania state law claims under the PMWA and the Wage Payment and Collection Law ("WPCL"), as well as his common law claim for unjust enrichment.[95] As set forth below, this Court should deny conditional certification of the

---

[91]Ex. 3, Dengler Decl. ¶6; Ex. 4, Fusselman Decl. ¶17; Ex. 6, Hare Decl. ¶5; Ex. 8, R. Kreiser Decl. ¶5; Ex. 9, S. Kreiser Decl. ¶12; and Ex. 12, Mingucha Decl. ¶19.

[92]Ex. A to the Motion, Expert Report of David L. Crawford, Ph.D., at FN 24, p. 19; *see also* Ex. 2, Expert Report of David Lamoreaux, Ph. D. at p. 8..

[93]Motion, p. 3.

[94]Motion, p. 4.

[95]The WPCL provides, in relevant part, that: "Every employer shall pay wages… due to his employees on regular paydays designated in advance by the employer." (43 P.S. §260.3.) Plaintiff alleges that because he was not paid for all hours worked under the FLSA and corresponding state law, Dollar General also violated the WPCL by failing to timely pay his wages (and those of the other proposed class members). Thus, Plaintiff's claim under the WPCL is not freestanding and necessarily depends on the success of his FLSA and PMWA claims. Likewise, Plaintiff's claim for

Collective Action Class and certification of the Rule 23 Class.

## A. <u>The Legal Framework</u>

Under the FLSA, employees must be paid for all time they are "suffer[ed] or permit[ted]" to work. (29 U.S.C. § 203(g).) However, not all time an employee spends at his jobsite is compensable work.[96] An employee need not be compensated for time spent traveling to and from his worksite (or from the time clock to his work area) or for other activities that precede or follow the employee's principal activities, unless those pre- and post-work activities are "integral and indispensable" to the employee's primary activities. (*See id.*) Likewise, the PMWA requires employers to "pay each of his or her employees wages for all hours worked[.]" 43 P.S. § 333.104(a). However, like the FLSA, the PMWA does not consider all time an employee spends on his employer's premises to be "time worked." Instead, "hours worked" is defined as follows:

> Hours worked—The term includes time during which an employee is ***required by the employer to be on the premises of the employer, to be on duty or to be at the prescribed work place***, time spent in traveling as part of the duties of the employee ***during normal working hours*** and ***time during which an employee is employed or permitted to work***; provided, however . . . that time spent on the premises of the employer for the convenience of the employee shall be excluded.

34 Pa. Code § 231.1 (emphasis added). Travel time *outside* of "normal working hours"; time spent on-site voluntarily; and other non-work activities at the worksite are not compensable. (*See id.*)

### 1. FLSA Case Law is Instructive of Plaintiff's PMWA Claims

Because of similarities between the PMWA and the FLSA, the two are interpreted similarly, and federal case law interpreting the FLSA is instructive of how the PMWA will be interpreted. "[W]hen the state statute substantially parallels the federal statute, it is proper to give deference to the federal interpretation of the federal statute." *Livi v. Hyatt Hotels Corp.*, 2017 WL 5128173, at *9 (E.D. Pa. Nov. 6, 2017) (citing *Commonwealth, Dep't of Labor & Indus. v. Stuber*,

---

unjust enrichment is derivative of Plaintiff's FLSA and PMWA claims in that it presupposes that Plaintiff and the other purported class members were not paid for all time worked.

[96] *See* Section III.A.2, *infra*.

822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *aff'd* 580 Pa. 66 (2004)). Here, Plaintiff's claims for unpaid overtime under the PMWA should be analyzed consistent with his FLSA claims because the language under the PMWA "substantially parallels" the language used in the FLSA. *Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 612–13 (E.D. Pa. 2015) (applying the same analysis as the FLSA claims because "the state statute at issue substantially parallels the federal law").[97]

### 2. The Portal-to-Portal Act and the Continuous Workday Rule Demonstrate that Time Spent Traveling to and from the Worksite is not Compensable

The Portal-to-Portal Act exempts the following activities from being compensable work: (1) "walking, riding, or traveling" to and from the location where an employee performs his or her principal activity; and (2) "preliminary activities" which occur before an employee starts any principal activity, as well as "postliminary activities" which occur after an employee ceases all principal activities. *See Lugo v. Farmer's Pride Inc. (Lugo III)*, 802 F.Supp.2d 598, 603 (E.D. Pa. 2011) (quoting 29 U.S.C. § 254(a)). Under the Act, activities performed by employees before or after their scheduled shifts may be compensable only if they are "integral and indispensable" to the employees' principal activities. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28–30, (2005). A task is "integral and indispensable" to the principal activities that an employee performs "if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 517 (2014).[98]

#### a. Pre-Shift Travel Time (Even On-Site, and Post-Clock In) is *Not* Compensable

[97] *See also Razak v. Uber Techs., Inc.*, 2016 WL 5874822, at *7 (E.D. Pa. Oct. 7, 2016) (same); *Philadelphia Metal Trades Council v. Konnerud Consulting W., A.S.*, 2016 WL 1086709, at *5 (E.D. Pa. Mar. 21, 2016) (same); *In re Amazon.com, Inc., Fulfillment Ctr. Fair Labor Standards ACT (FLSA) & Wage & Hour Litig.*, 2018 WL 4148856, at *2 (W.D. Ky. Aug. 30, 2018) (definition of compensable time under the PMWA and the FLSA are "nearly identical").

[98] Although the Department of Labor has adopted the continuous workday rule—which generally defines a compensable workday as "the period between the commencement and completion on the same workday of an employee's principal activity or activities"—activities that occur during a *bona fide* meal period are not compensable. *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 370 n.8 (3d Cir. 2007) (quoting 29 C.F.R. § 790.6(b)); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 363 (4th Cir. 2011) ("[T]he continuous workday does not include time spent during a "bona fide meal period.") (citations omitted). Furthermore, as explained below, activities that are preliminary or postliminary to the employee's principal activities are not compensable. *See* Section III.A.2.a, *infra*.

"[T]he fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity.'" *Alvarez*, 546 U.S. 21 at 40. In *Alvarez*, the Supreme Court held that "walking from a timeclock near the factory gate to a workstation" is also not "integral and indispensable" to any principal activity and thus is not compensable. *Id.* (citing *Steiner v. Mitchell*, 350 U.S. 247 (1956)); *see also* 29 C.F.R. § 785.34 ("[T]raveltime at the commencement or cessation of the workday ... (such as underground travel in mines *or walking from time clock to work bench*) need not be counted as working time[.]") (emphasis added); 29 C.F.R. § 790.7(g) ("Other types of activities which may be . . . considered 'preliminary' or 'postliminary' activities, include *checking in and out* ...) (emphasis added); *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 13432–43 (11th Cir. 2007) (employees' "mandatory travel time" from security check point to work site was not compensable because it occurred before the start of the workday); *Griffin v. S & B Engineers & Constructors, Ltd.*, 507 Fed. Appx. 377, 382–83 (5th Cir. 2013) (employees' pre-shift and post-shift travel time on company buses from mandatory parking lot to work site was not compensable, even though employees were subject to employer's rules of conduct while riding the bus); and *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1288–89 (10th Cir. 2006) (employees' pre-shift travel time from convenience store to work site was not compensable, even though some employees were required to meet at the convenience store to carpool together while also transporting their personal safety equipment and other tools and paperwork in the vehicle).[99]

Moreover, the Supreme Court has rejected the notion that an activity is "integral and indispensable" merely by the fact that the employer required the activity. *See Busk*, 135 S. Ct. at

[99] *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 Fed. Appx. 448, 454 (5th Cir. 2009) ("walking to and from their lockers at the beginning and end of each shift," "donning and doffing of general protection gear," and "obtaining standard tool bags" near the lockers are preliminary, non-compensable tasks under Portal-to-Portal Act).

519 ("The Court of Appeals erred by focusing on whether an employer *required* a particular activity.... . If the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal–to–Portal Act was designed to address.") (emphasis in original). Rather, the "integral and indispensable" activity must be "an intrinsic element" of the employee's principal activities and "one with which the employee cannot dispense if he is to perform his principal duties." *Id.*

### b. Bona Fide Meal Breaks (and Any Donning and Doffing/Travel Time Associated Therewith) Are Excluded from the Continuous Workday Rule and Are Not Compensable

In *Mitchell v. JCG Industries, Inc.*, the Seventh Circuit held that, for purposes of the continuous workday rule, "[w]orkers given a half-hour lunch or other meal break from work are in effect working two four-hour workdays in an eight-and-a-half-hour period." 745 F.3d 837, 839 (7th Cir. 2014). Based on this rationale, the Seventh Circuit held that time spent by employees changing clothes during a bona fide meal break[100] is not compensable under the FLSA. *Id.* The Fourth Circuit has reached the same conclusion. *See Sepulveda v. Allen Family Foods, Inc.*, 591 F.3d 209, 216, n.4 (4th Cir. 2009) ("[T]he employees seek compensation for the time they spend during their lunch breaks donning and doffing a few items, washing, and *walking to and from the cafeteria*. This time is non-compensable, however, because it is part of a bona fide meal period[.]") (citing 29 C.F.R. § 785.19) (emphasis added); *Perez*, 650 F.3d at 363 (same); *see also Naylor v. Securiguard, Inc.*, 801 F.3d 501, 505 (5th Cir. 2015) ("A meal break often does not allow for eating during the entire break; some time may be needed to move to another area of the workplace or to leave the workplace. . . . [which] does not undermine the non-compensable nature of the break."). This Court has cited the Fourth Circuit's decisions in *Sepulveda* and *Perez* with approval. *See Lugo*

[100]In determining whether a break qualifies as a "bona fide meal period," the Third Circuit considers the totality of the circumstances to determine (case-by-case) to whom the benefit of the inures. *Babcock v. Butler County*, 806 F.3d 153, 157 (3d Cir. 2015). If time is predominantly for the employee's benefit, the break is bona fide. (*Id.*)

*III*, 802 F. Supp. 2d at 609 ("This Court . . . finds persuasive the Fourth Circuit's opinion in *Perez*. . . . Donning, doffing, hanging, washing, and retrieving PPE before and after meals is not compensable if the activity occurs during a bona fide meal period."). Thus, meal breaks, and any travel time and/or donning and doffing associated therewith, are not compensable.

### 3. Donning and Doffing is Only Compensable if, Among Other Things, it is Required or Controlled by the Employer and "Integral and Indispensable" to an Employee's Principal Activity

In *Lugo III,* this Court held that "[d]onning, doffing, retrieving, and washing PPE" is compensable if the activity meets the following five conditions:

(1) "[it] is required or controlled by the plant"
(2) "[it] primarily benefits the plant rather than the employees' comfort and convenience";
(3) "[it] is integral and indispensable to the [employee's] principal activity ...";
(4) "[it] occurs during the continuous workday"; and
(5) "[it] requires more than a de minimis amount of time."

*Lugo III*, 802 F. Supp. 2d at 609. Courts consistently find that tasks such as "putting on a pair of boots. . . a cap, and ear plugs [are] difficult to distinguish from the act of 'changing clothes and showering under normal conditions,' an act that is by definition preliminary or postliminary to work activities." *See, e.g.*, *Alford v. Perdue Farms, Inc.*, No. Civ. A. 5:07-CV-87CAR, 2008 WL 879413, at *6 (M.D. Ga. Mar. 28, 2008) ("It is something that the employee can do at his home, in his car, or whenever suits his convenience. It is a task that adds little, if any, time and effort to the ordinary act of . . . getting dressed that every person undertakes every day."); *Guyton v. Tyson Foods, Inc.*, 767 F.3d 754, 761 (8th Cir. 2014) (that equipment could be worn home, was optional, or was for employee's comfort was evidence it was not "integral and indispensable classwide").

### 4. *De Minimis* Doctrine Counsels that Activities that Take Insignificant Time are Non-compensable; Do Not Trigger the Start of the Continuous Workday

"In recording working time under the [FLSA], insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded." 29 C.F.R. § 9785.47. The *de minimis*

doctrine "provides a limiting principle to compensation for trivial calculable quantities of work" and conforms to "the realities of the industrial world." *De Asencio*, 500 F.3d at 374. "When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. . . . It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Id.*

In determining whether time is *de minimis,* courts consider "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Id.* at 374 (quoting *Lindow v. United States,* 738 F.2d 1057, 1063 (9th Cir.1984)) (holding that time difficult to calculate, small in the aggregate, and irregularly performed is *de minimis*). "Though there is no precise amount of time that courts have labeled *de minimis* per se, most courts have found daily periods of approximately 10 minutes *de minimis*[.]" *Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1082 (9th Cir. 2016) (internal citations omitted); *see also Anderson v. Pilgrim's Pride Corp.*, 147 F. Supp. 2d 556, 564 (E.D. Tex. 2001), *aff'd*, 44 Fed. Appx. 652 (5th Cir. 2002) ("The majority of courts have found daily periods of approximately 10 minutes *de minimis* as a matter of law.").

**5. Rounding is Expressly Endorsed by the DOL and the Relevant Case Law**

The DOL has expressly endorsed the practice of rounding punch times to the nearest quarter of an hour, "provided that [rounding] is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time *they have actually worked*." 29 C.F.R. § 785.48(b) (emphasis added). "This regulation permits employers to efficiently calculate hours worked without imposing any burden on employees, offering employers a practical method for calculating work time and a neutral calculation tool for providing full payment to employees." *Corbin,* 821 F.3d at 1075 (quotation marks omitted).

Moreover, DOL regulations also recognize that the period during which an employee is

clocked in does not necessary equate to the time that the employee spent performing compensable work. *See* 29 C.F.R. § 785.48(a) ("Minor differences between the clock records and actual hours worked cannot ordinarily be avoided[.]"). "[E]mployees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided . . . that they do not engage in any work." *Id.*; *see also Weil v. Metal Techs., Inc.*, 260 F. Supp. 3d 1002, 1013 (S.D. Ind. 2017) ("This regulation specifically contemplates circumstances in which there may be a difference between time clock records and actual hours worked, and it belies Plaintiffs' contention that 'time clock records are records of work.'") (citing 29 C.F.R. § 785.48(a)); *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (employees who clock in early do not have to be paid so long as they are not working).[101]

## B. The Court Should Deny Conditional Certification of Plaintiff's FLSA Claims

### 1. The Traditional Standard for Conditional Certification Used In Cases (Unlike This One) with Limited Factual Discovery

Under the FLSA, an employee may sue an employer on behalf of himself and other employees only if the employees whom he seeks to represent are "similarly situated" and give their consent in writing to become party plaintiffs.[102] The plaintiff bears the burden of demonstrating that he and those whom he seeks to represent are similarly situated.[103] While the FLSA does not define "similarly situated," most courts, including those in this circuit, employ a two-stage process to determine whether a claim can proceed as a collective action.[104]

During the traditional first-stage, which usually involves limited discovery (if any), the court determines whether a class should be conditionally certified for the purpose of notice to

---

[101]As discussed *supra*, Plaintiff's expert, Dr. Crawford, was not made aware of this case law, and based his analysis on the faulty assumption that clocked-in time is the same as compensable time. *See* discussion at p. 3, FN 12, *supra*.

[102] *See* 29 U.S.C. § 216(b); *Sperling v. Hoffman La-Roche, Inc.* (*Hoffman-La Roche I*), 862 F.2d 439, 444 (3d.Cir. 1988) *aff'd and remanded sub nom. Hoffmann-La Roche Inc. v. Sperling (Hoffman-La Roche II)*, 493 U.S. 165 (1989) (explaining the two requirements for a § 216(b) collective action–similarly situated and individual consents).

[103] *Burkhart-Deal v. Citifinancial, Inc.*, No. 07-1747, 2010 WL 457127, at *3-4 (W.D. Pa. Feb. 4, 2010).

[104] *Wright v. Lehigh Valley Hosp. & Health Network*, No. 10-431, 2011 WL 221770, at *2 (E.D. Pa. Jan. 20, 2011).

potential opt-in plaintiffs and for pretrial discovery regarding their individual claims. *Wright*, 2011 WL 221770, at *2. Traditionally, at this conditional certification stage, the court "should review the pleadings and the affidavits of the parties to decide if the proposed class consists of similarly situated employees." *Id.* Important considerations in making this determination include "whether potential plaintiffs were identified; whether affidavits of potential plaintiffs were submitted; ... whether evidence of a widespread discriminatory plan was submitted; and whether as a matter of sound case management; ... a manageable class exists." *See Hickton v. Enter. Rent-A-Car Co. (In re Enter. Rent-A-Car Wage & Hour Empl. Practices Litig.)*, 2010 WL 3447783, at *20 (W.D. Pa. Aug. 13, 2010) (internal citations omitted). "If the plaintiff carries [his] burden, the court [may] conditionally certify the class for the purpose of notice and discovery."[105] Thereafter, at the second stage and after the close of discovery, "the defendant [can] move to decertify the class."[106]

Weller seeks conditional certification of his FLSA claims. A majority of courts in the Third Circuit hold that the first stage inquiry requires a plaintiff to make "modest factual showing that the proposed recipients of opt-in notices are similarly situated to the named Plaintiff." *See, e.g., Wright*, 2011 WL 221770, at *2. This standard requires evidence "beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Holley v. Erickson Living*, No. 11-2444, 2012 WL 1835738, at *3 (E.D. Pa. May 21, 2012) (quoting *Hoffmann-La Roche Inc. v. Sperling (Hoffman-La Roche II)*, 493 U.S. 165, 172 (1989)).

If a class is conditionally certified, the court makes a final determination in the second (decertification) stage, after more evidence is available, as to whether purported class members are similarly situated. The second step consists of a "specific factual analysis of each employee's claim

---

[105] *Wright*, 2011 WL 221770, at *2.
[106] *Id.*(internal citations omitted).

to ensure that each proposed plaintiff is an appropriate member of the collective action." *Lugo v. Farmer's Pride Inc. (Lugo I)*, No. CIV.A. 07-CV-00749, 2008 WL 638237, at *3 (E.D. Pa. Mar. 7, 2008). "At this second stage, the court will again make a certification decision based on the 'similarly situated' standard, but will require a higher level of proof than was necessary at the first stage. . . ." *Id.* Important considerations in the decision to decertify are: the "(1) disparate factual and employment settings of individual plaintiffs; (2) the various defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Hickton*, 2010 WL 3447783, at *21. "If the conditional group of plaintiffs does not meet . . . [the similarly situated] standard at the second stage, the group is then decertified, the opt-in plaintiffs are dismissed without prejudice and any remaining plaintiffs are permitted to move onto the trial stage of litigation." *Lugo I*, No. CIV.A. 07-CV-00749, 2008 WL 638237, at *3.

**a. A More Rigorous Stage One Standard Applies Where, As Here, the Parties Have Engaged in Substantial Discovery**

Where, as here, significant discovery has been conducted, but is not complete and the case not "ready for trial", courts apply a hybrid "intermediate" standard in conducting their first stage analysis. *See, e.g., Hickton*, 2010 WL 3447783, at *20-27; *Bunyan v. Spectrum Brands, Inc.*, No. 07-CV-0089-MJR, 2008 WL 2959932, at *4 (S.D. Ill. July 31, 2008); *see also Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 895 (N.D. Iowa 2008); *Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D. Del. 2007); *Thiessen v. General Elec. Capital Corp*, 996 F. Supp. 1071, 1081 (D. Kan. 1998). Where an intermediate standard is applied, the court will consider – at the outset – factors at issue in both the first and second steps, and hold the Plaintiff to a higher burden of proof related to whether he is "similarly situated" to his proposed class. Both first and second step considerations are relevant. *See Hickton*, 2010 WL 3447783, at *20-21.

**b. The Parties Have Conducted Substantial Class Certification Discovery**

This case was filed almost a year and a half ago, and substantial discovery related to the

operations of the Bethel DC has been completed.[107] Both parties have been deposed; close to 5,000 pages of documents produced (including those produced pursuant to a search of certain electronically stored information); a sample of clock-in clock-out records for the Bethel DC's hourly work force provided by Defendant;[108] and (to evaluate the sample) experts retained; reports exchanged and Plaintiff's expert deposed. As such, an intermediate approach is warranted here.

### 2. Conditional Certification Should be Denied Because Plaintiff Has Failed to Present Substantial Allegations that Proposed Class Members were Subject to a Single Decision, Plan or Policy that Violated the FLSA

Even applying a traditional, first-stage analysis, conditional certification should be denied because Plaintiff is unable to demonstrate that the proposed Collective Action Class is similarly situated. To be similarly situated, a plaintiff must present evidence that he and the thousands of individuals he seeks to represent have been subject to the same common and *unlawful* policy in the same way, such that the case can be tried on a representative basis. *See Hoffmann-La Roche II*, 493 U.S. at 170 (in ADEA action, which uses the same opt-in joinder mechanism, collective actions are intended to resolve "common issues of law and fact arising from same *alleged discriminatory* activity") (emphasis added); *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (to establish they are "similarly situated," plaintiffs must show they "were victims of a common policy or plan *that violated the law*") (emphasis added).

This Court has recognized that "[b]eing similarly situated does not mean simply sharing a common status . . . [r]ather, it means that one is subjected to some common employer practice that, if proved, *would help demonstrate a violation of the FLSA*." *Martin v. Citizens Fin. Group, Inc.*,

---

[107]Thus far, to reduce the costs to the parties and promote judicial efficiency, discovery in this case has been limited to information concerning the Bethel DC only. Dollar General believes that the evidence related to Bethel is sufficient to warrant denial of conditional certification of the Collective Action Class and Certification of the Rule 23 Class. However, in the event that a class is conditionally certified, further discovery into the operations of the remaining 14 DCs will further demonstrate that the differences among proposed class member's experiences are too great to warrant class certification.

[108] *See* Ex. 1, Allen Decl. ¶2.

CIV.A. 10-260, 2013 WL 1234081, at *3 (E.D. Pa. Mar. 27, 2013) (citing *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 538 (3d Cir.2012)). A common, facially *lawful* scheme of compensation is insufficient to warrant conditional certification; instead, a plaintiff "must present 'substantial evidence that [the employer], in fact, shirked its FLSA responsibilities.'" *Id.* (citing *Camesi v. University of Pittsburgh Med. Cent.*, 2011 WL 6372873, at *4 (W.D. Pa., Dec.20, 2011)).

**a. There is no Common Policy or Practice Requiring Employees to Work Before the Official Start of their Shift, or After their Shift has Ended**

***(1) Plaintiff has Failed to Present Evidence that Employees Engaged in Compensable Donning and Doffing, or that Any Common Donning and Doffing Practice Exists***

Plaintiff contends that Dollar General maintained a common policy requiring employees to don and doff PPE or gear while off-the-clock and, in doing so, failed to compensate employees for all hours.[109] However, Plaintiff has presented no evidence of such a policy outside of his own testimony that he donned and doffed equipment off-the-clock. However, pre-shift donning or post-shift doffing is not *required* by Dollar General; at most, the evidence shows that *certain* employees were expected to *gather* (but not "don") one or two items from their lockers prior to the start of their shift, and to drop them off at its conclusion. Declarants state that equipment, even when gathered from lockers, is merely carried to an employee's work area and "donned" thereafter. Moreover, the evidence shows that the use of PPE varied across different positions (and, in some cases, was not used at all), and that no uniform policy/practice dictated where such equipment was kept, and thus, whether it was donned (or most often, only gathered) pre- shift or sometime after.

[109]Plaintiff cites *Lugo v. Farmers Pride, Inc.* (*Lugo State)*, 2009 PA Super 5, 6-7, 967 A.2d 963, 967-969 and *Keller v. TD Bank, N.A.*, No. 12-5054, 2014 WL 5591033 (E.D. Pa. Nov. 4, 2014) for the proposition that time spent donning and doffing is compensable under the PMWA. *See* Motion p. 30. However, both are distinguishable. In *Lugo State*, because the court was addressing a demurrer, its holding was limited to a determination of the sufficiency of the plaintiffs' pleadings. Similarly, in *Keller*, the court was *not* considering the propriety of the class action mechanism at all (and instead was merely approving of a settlement pursuant to *an unopposed motion*), the court noted that "[t]here is no suggestion that all employees were not treated uniformly with regard to [their pre- and post- shift] . . . work activities." *Keller*, No. 12-5054, 2014 WL 5591033 at *5. The evidence before this Court is quite different, requiring a different conclusion under a much different legal standard.

Further, as noted above, donning and doffing of PPE or gear is compensable only when certain factors are met.[110] Thus, even if some employees *do* engage in pre- and post- shift donning and doffing (and it is undisputed that many do not even use PPE or other equipment), such time would be non-compensable because: it is not "required or controlled by" Dollar General"; it is not "integral and indispensable" to the employee's principal activity; and/or it is *de minimis*. Accordingly, for each purported class member, a determination of liability would require an inquiry not only into what PPE/gear is used (if any), but also into where it is kept; when and where it is donned and doffed; how long any such donning and doffing takes; and whether such donning and doffing is "integral and indispensable" (or, as discussed below, completely unnecessary). These questions cannot be answered by reference to a common policy or practice, but instead, require a series of mini-trials, making certification unmanageable and inappropriate.[111]

***(a) Those Employees Who Do Use PPE/Gear Gather Such Items Pre-Shift (If at All) and do Not "Don" Until After the Start of Shifts***

Plaintiff alleges that employees are required keep PPE in, and don it at, their lockers before clocking in, and doff it at their lockers after clocking out. Notably, Plaintiff failed to produce any evidence from the employees he contends engage in such behavior. Further, testimony from Defendant's declarant establishes that no such common practice exists. While Weller claims that (at times) *he* donned items at his lockers, other putative class members stated that, while PPE/gear may have been picked up from their lockers (provided for their convenience)[112] on the way to the time clocks, it was not donned until their SUM (and *after* beginning compensable time).[113]

[110] *See* Section III.A.3, *supra*.
[111] *Fox v. Tyson Foods, Inc.*, No. 4:99-CV-1612-VEH, 2006 WL 6012784, at *5 (N.D. Ala. Nov. 15, 2006) (denying motion to certify FLSA class because there was "no single, uniform plan . . . of not compensating employees for time spent donning and doffing protective gear," especially in light of evidence that "some employees, who are members of the [putative] class, are compensated for donning and doffing time . . .").
[112] *See* p. 45, FN 198, *infra*.
[113]Ex. 3, Dengler Decl. ¶7; Ex. 1(E), Summary Chart E (summarizing employee's donning/doffing practices, if any).

Other declarants report that they <u>do not have a locker</u> in which to store PPE/gear at all,[114] or that – despite having a locker – their PPE/gear is kept at or near their worksite.[115] Because of the layout of the Bethel DC (which has lockers and time clocks by the entrance), items stored at an employees worksite (as opposed to a locker) are necessarily accessed *after* clocking in, and put away *before* clocking out.[116] Maintenance Technicians, who have a second locker past the time clocks, also necessarily access any equipment on-the-clock,[117] contrary to Plaintiff's class theories.

***(b) Even if Employees Don and Doff Equipment at their Lockers, Doing so is not "Integral and Indispensable" to the Employee's Primary Activities, and Thus is Not Compensable***

Even if some employees don or doff PPE /gear at their lockers (as Weller claims he did), these activities are not "integral and indispensable" to the employees' primary activities, and thus, are not compensable. Not only is it unnecessary for employees to don PPE/gear prior to the start of their shifts, but it may – in fact – be nonsensical to do so.[118] Headsets, for example, are operational only after inserting a battery that is kept at the employees' workstations and made available at the SUM. If an employee *did* choose to don her headset at the lockers prior to the start of shift, she would have to remove it at her SUM to install the necessary battery. Likewise, belts worn by Pickers are made to carry handheld computers (commonly called "eggs"), which employees collect *after* their SUM.[119] To attach the egg to the belt (using its belt-looped case), requires removal of the belt. *Id.* Thus, pre-shift time spent putting on a headset or belt is *not* integral and indispensable to any primary activity, as it is unnecessary (and, in fact, a waste of time).

***(c) Even If Employees Don and Doff Equipment at their Lockers, and the Same Could Considered "Integral and Indispensable" (which it***

[114]Ex. 4, Fusselman Decl. ¶6; Ex. 6, Hare Decl. ¶10; Ex. 8, R. Kreiser Decl. ¶13; and Ex. 14, Nelson Decl. ¶10; *see also*, Ex. 9, S. Kreiser Decl. ¶4 (never uses locker).

[115]*See* Ex. 4, Fusselman Decl. ¶5; Ex. 9, S. Kreiser Decl. ¶4; Ex. 10, Mast Decl. ¶11; Ex. 12, Mingucha Decl. ¶8.

[116] *See* Ex. 1(H), Massey Dep. 131:6-9.

[117]Ex. 3, Dengler Decl. ¶8; *see also* Ex. 17, Telford Decl. ¶9.

[118]Ex. 18, Delgado Decl. ¶9; Ex. 19, Ferguson Decl. ¶7.

[119]Ex. 19, Ferguson Decl. ¶10; Ex. 13, Murry Decl. ¶4; Ex. 18, Delgado Decl. ¶10.

***Cannot) this Time is De Minimis***

Even if certain employees donned or doffed (integral and indispensable) equipment at their lockers, such activities are *de minimis* (and thus, noncompensable). *See* Section III.B.3, *infra*[120].

***(d) Many Proposed Class Members Do Not Don or Doff any PPE or Specialized Gear; For Others, Donning and Doffing is Not "Required or Controlled" by Dollar General***

**(i) Many Positions Require no PPE or Specialized Gear**

Certain members of Plaintiff's purported class are not required to wear PPE/gear in connection with their assigned job positions. Checkers, Loop Operators, and employees in support functions (i.e., WMS Clerks, Maintenance Technicians, office employees, etc.), for example, have no PPE or other wearable gear.[121] Declarants Hare and Nelson stated that they do not use PPE as WMS or Maintenance Clerks, respectively.[122] Even among GWWs, the use of PPE varies and, in some cases, is nonexistent.[123] Because certain employees have no PPE or gear, they are not subject to a "common policy" that allegedly violates the FLSA related to donning and doffing of PPE/gear.

**(ii) Donning/Doffing of *Optional* Equipment is Not Compensable**

Other employees make use of *optional* PPE/gear. The law is clear that in these instances, because the employer does not *require* the use PPE/gear, time spent donning and doffing is not compensable. For example, Repack Pickers are provided aprons for their optional use, but aprons are not required.[124] Some wear them, and others do not.[125] Similarly, Rolltainer Repair Technicians are not required to wear gloves, but may opt to do so;[126] some Sanitation Workers wear disposal

---

[120]*See also* Ex. 1(F), Summary Chart F (summarizing testimony about minimal time spend "donning" gear).
[121]Ex. 1(H), Massey Dep. 166:13-22; Ex. 4, Fusselman Decl. ¶¶3, 6; Ex. 9, S. Kreiser Decl. ¶¶3, 8; Ex. 19, Ferguson Decl. ¶23.
[122]Ex. 6, Hare Decl. ¶6; *see also,* Ex. 14, Nelson Decl. ¶7; *see also* Ex. 1(D), Summary Chart D (summarizing PPE and other specialized gear used by GWWs).
[123]Ex. 3, Dengler Decl. ¶5 (PPE not required when performing jobs of rolltainer repair person); Ex. 4, Fusselman Decl. ¶¶4, 12 (no required PPE in current function as checker or as put away driver).
[124]Ex. 12, Mingucha Decl. ¶5; Ex. 19, Ferguson Decl. ¶13; Ex. 18, Delgado Decl. ¶8.
[125]Ex. 19, Ferguson Decl. ¶13; Ex. 18, Delgado Decl. ¶8.
[126]Ex. 16, Shaud Decl. ¶8.

gloves, but not all;[127] and Jockey Drivers may wear optional rain jackets.[128]

**(iii) Some Employees Own their own Gear or Store it at Home**

Even where a position requires the use of PPE, employees sometimes choose to use their own (rather than company-provided) PPE, or the PPE is otherwise under the employee's control, such that time spent donning and doffing is not compensable. For example, some employees choose to use their own prescription eyeglasses rather than Company-provided safety glasses, and, as one would expect, these employees wear their glasses home at the end of a shift.[129] Declarant R. Kreiser stated that as a yard jockey, he keeps his fluorescent company-provided safety shirts at home and dresses in them prior to arrival, and his other items (vest and rain coat) are kept in his car.[130] Declarant Erik Mingucha stated that he chooses to use an apron he brought from home, which he stores in his on-site locker for convenience, and a belt, that – while stored at work – he could take home if he wanted.[131] When PPE is owned by employees or loaned from an employer but kept in an employee's home or vehicle, donning and doffing is not compensable. *See, e.g.*, *Bamonte v. City of Mesa*, 598 F.3d 1217, 1232-33 (9th Cir. 2010).

Plaintiff falls well short of showing that his experiences are representative of any other employee, much less all hourly DC employees. This lack of any common practice would require individualized inquiries and, at best, a series of several mini-trials to parse out which employees (if any) might show compensable time related to donning and doffing.

***(2) Dollar General has no Policy or Practice of Requiring Employees Perform Compensable Activity Before the Start of Shift, Even After Clocking In***

Weller alleges that he engaged in the following activities after clocking in but before

[127]Ex. 17, Telford Decl. ¶9.
[128]Ex. 8, R. Kreiser Decl. ¶10.
[129]Ex. 4, Fusselman Decl. ¶12; Ex. 10, Mast Decl. ¶¶12-13.
[130]Ex. 8, R. Kreiser Decl. ¶¶8-10.
[131]Ex. 12, Mingucha Decl. ¶5.

beginning his shift and principal activities for the day: gathering supplies, operating power equipment, traveling across the warehouse floor to a mandatory SUM (where, among other things, employees received instructions, went over shift volume, and performed a daily equipment checklist).[132] As discussed above, there is no uniform policy or practice related to the gathering of PPE/gear.[133] Similarly, in regards to the "operation of power equipment," no uniform policy or practice exists. Many employees do not operate power equipment at all.[134] Others do so only *after* attending their SUM.[135] Still others note that, while they may operate equipment prior to the start of their shifts, it is only to ride to their SUM,[136] such that their time is not compensable.[137] Finally, there is no evidence, outside of Weller's own testimony about *his* experience that SUMs began before the start of shift (if an employee was required to attend such a meeting at all).[138] The entire balance of the evidence before the Court (including testimony from the workers who attend, and Supervisors who hold, SUMs) demonstrates that SUMs begin at or after the official start of shift, and thus any activities that occurred at or after such meetings were necessarily compensated.[139]

**b. Dollar General's Rounding Policy is Facially Neutral and does Not Result in Failure to Compensate Employees for all Hours Worked**

Rounding is permissible "provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have ***actually worked***." 29 C.F.R. § 785.48(b) (emphasis added); *see also Adair v. Wisconsin Bell, Inc.*, 2008 WL 4224360, at *11 (E.D. Wis. Sept. 11, 2008) (denying conditional certification related to

[132]Motion, pp. 18-19.
[133]*See* Section III.B.2.a.1, *supra*.
[134]*See, e.g.*, Ex. 6, Hare Decl. ¶6; Ex. 14, Nelson Decl. ¶8; Ex. 4, Fusselman Decl. ¶4 (no vehicle) Ex. 7, Harris Decl. ¶6 (no vehicle as stocker); Ex. 9, S. Kreiser Decl. ¶3 (no vehicle); Ex. 12, Minchuga Decl. ¶11 (no vehicle).
[135]*See* Ex. 10, Mast Decl. ¶7 (drives MUOP, but only after her Start Up Meeting); *see also* Ex. 19, Ferguson Decl. ¶19 (the MUOP Drivers he supervises claim their vehicles at their Start Up Meeting).
[136]*See* Ex. 17, Telford Decl. ¶6 (drives RTC to Start Up Meeting, but does not perform job duties on the way).
[137]*See Bonilla*, 487 F.3d at 1342–43 ("mandatory travel time" from check point to work site was not compensable as it occurred before the start of the workday, even though required to ride on company bus, carrying PPE).
[138]*See* SOF, Section II.A.2, *supra*.
[139]*See* Section III.B.2.b.2.b, *infra*.

rounding policy because plaintiffs failed to proffer evidence showing that the policy "result[ed] in a systematic under-reporting of overtime ***actually worked***") (emphasis added); *Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122, 1128 (C.D. Cal. 2011). As applied to hourly employees at the Bethel DC, Dollar General's facially-neutral rounding policy does *not* result in such a failure.

***(1) Dollar General's Rounding Policy is Facially Neutral***

Dollar General's rounding policy is facially neutral—start of shift clock-ins and end of shift clock-outs are rounded to the nearest quarter hour, regardless of whether the result is an increase or a decrease in an employee's time.[140] Similarly, meal periods are rounded to the nearest quarter hour, regardless of direction.[141] *See Utne v. Home Depot U.S.A., Inc.*, 2017 WL 5991863, at *3 (N.D. Cal. Dec. 4, 2017) ("The rounding policy rounds both up and down, and is thus facially neutral."); *see also Corbin*, 821 F.3d at 1076 ("District courts . . . have weighed in quite extensively, regularly upholding the validity of employers' neutral rounding practices."). By contrast, virtually all of the cases Plaintiff cites in support of certification involve a non-neutral policy of rounding in *one* direction only[142], such that time always rounds in favor of the employer.[143] *See* Motion pp. 34–35 n.65, 43–44 n. 71; *see also Corbin*, 821 F.3d at 1077 ("If an

---

[140]*See* SOF, Section II.B, *supra*.

[141]*Id*; *see also* p. 32, FN 150, *infra*.

[142]*See, e.g., Eyles v. Uline, Inc.*, No. 4:08-CV-577-A, 2009 WL 2868447, at *4 (N.D. Tex. Sept. 4, 2009), *aff'd*, 381 Fed. Appx. 384 (5th Cir. 2010) (employer deliberately altered time punches to insure they rounded down only); *Brown v. L & P Indus., LLC*, No. 5:04CV0379JLH, 2005 WL 3503637, at *2 (E.D. Ark. Dec. 21, 2005) (employer rounded to 15-minute increments, but not necessarily to the nearest one; rather, the employer decided how to round each employee's time "based on her knowledge of the employee"); *Chao v. Self Pride, Inc.*, No. CIV.RDB 03-3409, 2005 WL 1400740, at *6 (D. Md. June 14, 2005) (employer's policy was only to round *down* to the nearest hour and thus was not neutral); *Sloan v. Renzenberger, Inc.*, No. 10–2508–CM–JPO, 2011 WL 1457368, at *2 (D. Kan. Apr. 15, 2011) (employer's timeclock system "ignored any time such employees entered which was more than 10 minutes before their shift began" even though employees were required to be at work before the start of their scheduled shift); and *Schneider v. Union Hosp., Inc.*, 2016 WL 524354, at *2 (S.D. Ind. Feb. 10, 2016) (employer's policy always rounded in favor of the employer by rounding *up* clock-in times to the nearest one-tenth hour and rounding *down* clock-out times to the nearest one-tenth hour).

[143]The only rounding case cited by Plaintiff that involves a facially neutral policy like Dollar General's is *Austin v. Amazon.com, Inc.*, 2010 WL 1875811, *1 (W.D. Wash. May 10, 2010). *Austin*, which was decided on a Rule 12(b)(6) motion to dismiss, is distinguishable because the court was required to presume the truth of the plaintiff's allegation that the employer "benefit[ed] from up to seven minutes of uncompensated work when the employee clocks in early." (*Id.* at *2.) Here, Dollar General has provided sufficient evidence to overcome any presumption that an employee's

employer's rounding practice does not permit both upward and downward rounding, then the system is not neutral and 'will ... result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.'").

The evidence and case law make clear that Dollar's General's policy is "neutral" under the law, and thus cannot form the basis for class certification. First, there is no policy that required employees to clock-in 7 minutes early. Rather, employees are simply expected to arrive at their workstations in time to start their shifts – and consequently, are permitted to clock in *up to* 7 minutes early to arrive at their SUM or worksite timely.[144] While some employees may have clocked in a few minutes early, and had their non-compensable, pre-work time rounded (as the law permits), such time was not spent working, but rather was spent walking to their workstations.[145]

Second, Dollar General's policy rounds in both directions. Although employees are asked to clock in *no earlier than* 7 minutes prior to the start of their shifts, some clocked in earlier without repercussion (and had the start of their shifts rounded to an earlier time).[146] Likewise, while it is manifestly reasonable for an employer to expect employees to timely arrive at their work sites, employees were not uniformly disciplined for clocking in a few minutes late. In fact, several employees in the Sample clocked in late (and had their time rounded in their favor back to the start of their shift) without discipline.[147] Others took meal breaks that exceeded 30 minutes of clocked

---

clock-in time exactly corresponds with time "actually worked." *See, e.g.*, Section III.B.2.b.2 *infra*. Moreover, the *Austin* court never addressed "whether the putative class is sufficiently similar to support a collective action" since it was merely ruling on a Rule 12(b)(6) motion to dismiss. *Id.* at *3.

[144]*See* SOF, Section II.B.1.a, *supra*.

[145]*See* Ex. 1(B), Summary Chart B; *see also* Ex. 5, Garcia Decl. ¶6; Ex. 13, Murry Decl. ¶5; Ex. 9, S. Kreiser Decl. ¶9; Ex. 11, Mehler Decl. ¶7; and Ex. 6, Hare Decl. ¶11.

[146]*Compare* Ex. 20, Cullins Decl. ¶¶ 11, 12, and 13 (examples of employees who clocked in more than 7 minutes prior to the start of shift) *with* Ex. 21, Zappacosta Decl. ¶¶3-4 (noting these same employees were not disciplined).

[147]*Compare* Ex. 2, Expert Report of David Lamoreaux, Ph.D., p. 4 (examples of employees who clocked in late for a shift) *with* Ex. 21, Zappacosta Decl. ¶¶3-4 (noting these same employees were not disciplined)

out time (with off-the-clock time rounded in their favor back to 30 minutes) without discipline.[148]

At the Bethel DC, the end of shift time can vary because GWWs "work to completion" (that is, they work until daily tasks are fulfilled).[149] As such, an employee's clock out time is equally likely to round in favor of the employee as it is the employer, even when employees clock-out within 7 minutes of the end of their shift. There are 60 options (i.e., minutes) for when an employee could clock out in a given hour, each of which is equally likely under the work-to-completion scenario (making it equally as likely that time will be rounded forward as rounded backward). In practice, however, end-of-shift rounding often works in the employee's favor. A review of the Sample clock-in clock-out records shows that, together, the 73 potential class members chosen by Plaintiff's expert *gained* a total of 184 hours and 31 minutes as a result of end-of-shift rounding, as Plaintiff's expert admits.[150] Dollar General's rounding policy is not only facially neutral[151], but does, in practice, result in rounding in both directions.

***(2) Start-of-Shift Rounding Relates Only to Non-Compensable Time***

Plaintiff's certification argument related to Dollar General's rounding policy suffers from

[148] *Compare* Ex. 2, Expert Report of David Lamoreaux, Ph.D., p. 5 (quantifying examples of employee meal break clock out times between 31 and 37 minutes) *with* Ex. 21, Zappacosta Decl. ¶¶3-4 (these employees were not disciplined); *see also* Ex. 6, Hare Decl. ¶13; Ex. 12, Mingucha Decl. ¶16; Ex. 15, Rivera-Vega Decl. ¶10; Ex. 16, Shaud Decl. ¶13.

[149] *See* Ex. 3, Dengler Decl. ¶6; Ex. 4, Fusselman Decl. ¶17; Ex. 6, Hare Decl. ¶5; Ex. 8, R. Kreiser Decl. ¶5; Ex. 9, S. Kreiser Decl. ¶12; and Ex. 12, Mingucha Decl. ¶19.

[150] Ex. A to the Motion, Expert Report of David L. Crawford, Ph.D., at FN 24, p. 19; *see also* Ex. 2, Expert Report of David Lamoreaux, Ph. D. at p. 8. Further, Defendant's expert notes that, if non-compensable travel time were accounted for, this number would be even larger. Ex. 2, Expert Report of David Lamoreaux, Ph. D. at p. 9.

[151] Plaintiff cites *Binissia v. ABM Indus., Inc.*, No. 13 C 1230, 2014 WL 793111, at *4 (N.D. Ill. Feb. 26, 2014) for the proposition that Dollar General's rounding policy is not facially neutral, but this case is easily distinguished. There, the evidence showed that the employer *always* rounded an employee's clock-in to the start of shift, regardless of whether the employee clocked in more than 7 minutes early. *See id.* at n.2 ("Plaintiffs, however, have submitted evidence … that ABM actually rounded janitors' punch-in times to their scheduled shift times, *even if the punch-in time was greater than seven-and-a-half minutes before the scheduled shift time*.") (emphasis added). Further, evidence from 94 potential class members alleged that compensable work began as soon as employees clocked in, and thus it was evident that employees were not paid for all time worked. *Id.* In contrast, Plaintiff has no such evidence, and clock ins (and clock outs) are rounded neutrally up or down. In fact, the evidence demonstrates that start of shift was rounded in Dollar General's employees' favor when they clocked in more than 7 minutes before the start of shift or clock in a few minutes late. *See* Ex. 20, Cullins Decl. ¶¶ 10, 11, 12 and 13.

a fundamental flaw: it conflates clocked in time with compensable time. Because employees may clock in a few minutes before their scheduled start time, Dollar General's rounding policy may result in employee's start time being rounded up to the nearest quarter hour. However, this policy does *not* result in a systemic failure to pay employees for all hours worked because employees do not begin compensable work until the start of their shift.[152] The only evidence to the contrary is Plaintiff's testimony, and – even if his allegations are accepted – he is dissimilar from the proposed class. A determination of liability would require individual inquiries into the activities (if any) performed by each employee in the minutes between clocking in and the start of his or her shift.

DOL regulations expressly recognize that merely being clock in is not the same as performing compensable work. *See* 29 C.F.R. § 785.48(a) ("Minor differences between the clock records and actual hours worked cannot ordinarily be avoided[.]"). *Alonzo v. Maximus, Inc.* is instructive. 832 F. Supp. 2d at 1128. In *Alonzo*, the employer used a facially neutral time rounding policy similar to Dollar General's, rounding employees' clocked-time entries to the nearest quarter hour. *Id.* at 1126. The plaintiffs' expert witness analyzed a sample of the employees' clock-in and clock-out times and opined that the rounding system failed to compensate employees for "all the time they have actually worked." *Id.* at 1128. The court, however, rejected the plaintiff's reliance on time clock punches because there was no evidence that the clock-in and clock-out times "reflect time actually worked by Plaintiffs, as opposed to time Plaintiffs may have been present on Defendant's premises but not engaged in work activities." *Id.* Accordingly, the court granted summary judgment for the employer on the plaintiffs' rounding claims as there was insufficient evidence that plaintiffs were systematically underpaid for time "actually worked." *Id.* at 1129.

---

[152] *See* Section III.B.2.b.2.a & b, *infra*; Plaintiff's allegations to the contrary are supported by his own testimony only. His expert did not opine on the definition of "compensable" work (*see* Ex. 1(I), Crawford Dep. 25:13-20 "I'm not opining about what's compensable and what isn't compensable."), and Plaintiff offers evidence of no other purported class members alleging they performed compensable work pre- or post- shift.

### *(a) Per the Portal-to-Portal Act, Travel to Worksite is Not Compensable*

The Portal-to-Portal Act makes "'walking, riding, or traveling' to and from the location where an employee performs his or her principal activity" non-compensable. (*See Lugo III*, 802 F.Supp.2d at 598 (quoting 29 U.S.C. § 254(a)).) While declarants have testified that their usual practice is to clock in either on time or 1 to 7 minutes prior to the start of their shifts, they report that they do not begin their work duties until *after* their scheduled shift start time,[153] which should correspond to their rounded clock-in time. Their pre-shift time is spent traveling to their workstation or SUM (or on other, non-compensable activities).[154]

### *(b) Compensable Work Begins at Shift Start Time, When Employees Attend Start Up Meetings or Arrive at their Worksite*

Weller argues that certain of his SUMs began before his scheduled shift start-time, and as such, he was required to work off the clock.[155] However, Defendant's declarants state that they are either *not* required to attend a SUM *or* that their SUMs do not start until *after* the start of their shifts.[156] Moreover, Supervisors of hourly employees who hold SUMs confirm that they do not conduct such meetings until *after* the start of the shift.[157] Thus, hourly employees who attended SUMs with these declarants or under these Supervisors certainly are not similarly situated to Plaintiff, even if his individual allegations (not shared by a single other employee) are believed.[158]

### *(3) Employees are Relieved of Duty for at Least 30 Minutes During Each Meal Break, Regardless of "Clocked Out" Time and Thus Any Time Rounded Up to 30 Minutes is Non-compensable*

[153]*See* Ex. 1(B), Summary Chart B, Column B.
[154]*See* Ex. 1(B), Summary Chart B, Column A.
[155]Motion, pp. 18-19. *But see* FN 158, *infra* (Start Up Meetings that included Weller did not start before start of shift).
[156]*See* Ex. 1(B), Summary Chart B, Column C.
[157]*See* Ex. 19, Ferguson Decl. ¶5; Ex. 18, Delgado Decl. ¶¶5-6.
[158]Interestingly, although Weller would have attended Start Up Meetings with an entire shift of other employees, he has offered no declarations to support his deposition testimony that his Start Up Meetings normally started 4-5 minutes before his start of shift. Whether or not Weller's memory is accurate, his claimed situation is certainly not shown by the evidence to be one shared by any other hourly employee in Bethel, including employees who worked with Weller and attended the Start Up Meetings that he attended. *See* Ex. 11, Mehler Decl. ¶10 (worked with Weller and attended same Start Up Meetings; does not recall a Start Up Meeting that start before the start of the shift); Ex. 19, Ferguson Decl. ¶¶4-5 (conducted Start Up Meetings attended by Weller, and began them after the start of shift).

Plaintiff's theory of liability (and alleged common proof) related to meal breaks is fundamentally flawed because it again equates clocked in time with time worked. Plaintiff offers no evidence that compensable work is performed in the minutes before and after meal break punches. The record, instead, demonstrates that when an employee does clock in fewer than 30 minutes after the start of her meal break, it is so that she can get back to her workstation in a timely manner.[159] Even Plaintiff admits that, when travel time is accounted for, he is off-duty for more time than his clock-in clock-out records suggest.[160] Time spent walking or driving to and from an employee's worksite and donning/doffing PPE/gear during a meal break is noncompensable.[161]

Here, employees are completely relieved of duty during their meal breaks, including during their travel time to and from their worksite to the breakroom.[162] Thus, any pre- and post- meal break travel time is non-compensable. Testimony confirms that even where an employee's unrounded clock-in clock-out records show fewer than 30 minutes for a meal break, the employee nonetheless has been off-duty for 30 minutes or more,[163] as the employee is actually relieved of duty for more time than demonstrated by the time punch records.[164] The productivity detail from the LMS system, although not conclusive because it cannot be said to capture all compensable tasks, is relevant to show the length of time around meal breaks that employees were not performing their assigned job functions, such as picking for a Picker.[165] A sample of LMS data compared to Kronos clock-in clock-out data illustrates that the time off from the productive tasks performed before and after meal breaks exceeds 30 minutes, even when the clock-in clock-out

[159] *See* Ex. 1(A), Summary Chart A, Column B.
[160] *See* Ex. 1(G), Weller Dep. 153:15-24 (conceding that even if he was clocked out for 28 minutes at lunch, he was off duty for additional travel time).
[161] *See* Section III.A.2.2, *supra* (travel time and donning/doffing before and after meal periods is not compensable).
[162] *See* Ex. 1(A), Summary Chart A, Column C (no work is performed on the way to or from a meal break); *see also* Ex. 19, Ferguson Decl. ¶¶20-21; Ex. 18, Delgado Decl. ¶15.
[163] *See* Ex. 1(A), Summary Chart A, Column A.
[164] Ex. 1(A), Summary Chart A, Columns A & B; *see also* Ex. 14, Nelson Decl. ¶14.
[165] *See e.g.,* Ex. 20, Cullins Decl. ¶ 5(c), Ex. 20(c) at p. 1.

duration for meal breaks is under 30 minutes.[166] This evidence pinpoints the fatal flaw in Plaintiff's argument, which assumes (without evidentiary support) that employees are performing compensable work the second before they clock out for their meal break, and again the second they clock back in. LMS records do not support this assertion. *Id.*

Determining whether any employee performed compensable work during any part of a 35-minute break in productivity would require individual proof and, for each employee, a mini-trial. Without evidence that employees were systematically *not* relieved from their job duties for 30 minutes or more pursuant to some uniform policy (evidence which Plaintiff does not have nor attempt to offer), there is no support for the allegation that employees were deprived of any compensable time when they were charged an unpaid meal break of 30 minutes. The evidence demonstrates that employees are relieved from duties before they clocked out (to walk to the time clock and/or to doff any required gear) and are relieved of duties after they clock back in (to walk back to the work station and don any required gear), resulting in meal breaks that exceed not only the clocked out period, but also the amount of time charged for an unpaid meal break – 30 minutes. There is simply no common evidence that employees accrued any compensable time during meal breaks for which they were not fully paid.

***(4) End-of-Shift Rounding Favors Employees; or is Not Compensable***

Per Plaintiff's expert, end-of-shift rounding generally "increases measured worktime," favoring employees,[167] and thus, collectively, there is no time being rounded away (such as to wonder if any rounded time was compensable). However, even if a single employee was to allege that his end-of-shift time rounded in Dollar General's favor (which not even Weller does), that is hardly the necessary ingredient for class certification under either the FLSA or Rule 23. Plaintiff

[166] *See* Ex. 20, Cullins Decl. ¶¶ 5(c), 6(c), 7(c), 8(c), and 9(c), Ex. 20(c) at pp. 1-5.
[167] Ex. A to the Motion, Expert Report of David L. Crawford, Ph.D., at FN 24, p. 19.

has presented no evidence that compensable work was performed during any such rounded time. To the contrary, the declarants cited by Dollar General report that employees doff at the worksite or otherwise before clocking out (and not at the lockers after clocking out),[168] and that they end their job duties in their work areas before walking back to the time clocks to clock out.[169] Plaintiff alleges no other post-shift allegedly compensable activities, and thus there is no evidence of a common policy of rounding away post-shift compensable work.

**3. The *De Minimis* Doctrine Counsels Against Class Certification**

Even pre- and post-shift activities that could be considered "work" (if any) are not compensable if they are *de minimis*. Thus, even assuming an employee engaged in compensable donning/doffing (or other compensable pre- or post-shift work), a determination of liability would require an individual analysis into whether any such time was *de minimis*. Although there is disagreement among Courts as to exactly how much time is considered *de minimis*, the time in this case—seconds or minutes at most— fall beneath the required threshold. *See Farris v. County of Riverside*, 667 F.Supp.2d 1151, 1165 (C.D.Cal.2009) (granting summary judgment to employer where pre-shift donning and doffing activities took no more than 9 minutes per day); *Hesseltine v. Goodyear Tire & Rubber Co.*, 391 F.Supp.2d 509, 520 (E.D.Tex.2005) (claims for unpaid activities taking "ten minutes or less are *de minimis* as a matter of law."); *Lindow*, 738 F.2d at 1062 (finding 7 to 8 minutes in unpaid pre-shift work *de minimis*).

Here, Plaintiff alleges that, before he clocked in at the Bethel DC, he visited his locker to

---

[168] *See* Ex. 1(E), Summary Chart E.

[169] *See* Ex. 18, Delgado Decl. ¶16 ("After completing their assigned daily duties, Pickers, Stockers, and MUOP Drivers walk back to the time clocks (without performing additional work duties along the way) and clock out.); Ex. 4, Fusselman Decl. 10 ("When I finish my job duties, I walk to the front of the building (while on the clock) so that I can clock out at the time clocks closest to the employee exit."); Ex. 6, Hare Decl. ¶14 (at end of shift, stops work, collects personal belongings and then walks 3-5 minutes to time clock); Ex. 9, S. Kreiser Dec. ¶12 (after work duties are complete, gathers lunch box from refrigerator and then walks 4-5 minutes to clock out).

unload his personal items, gather needed equipment and put on his PPE.[170] According to his Motion, "most hourly distribution center employees," but admittedly "not all," had to don "equipment in their lockers including, but not limited to, an RTC, a headset, a box cutter, label container/canister, pallet jacks, MUOPs, box cutters [sic], handheld devices, walkie talkies,[171] safety glasses, and/or gloves."[172] Many of these items cannot fit into a locker at all,[173] and other items, as Plaintiff admits, took just seconds to gather or "don" (if "donning" was, in fact, required).

Headsets are "pull[ed] around your neck in seconds";[174] box cutters are put in pockets in "seconds";[175] glasses took "seconds" to gather and stash in an employee's pocket;[176] gloves (which Plaintiff testified were not donned at lockers at all) took only 5 seconds to put on, and presumably even less to merely pick up;[177] and cut-resistant sleeves could be put on in 2-3 seconds.[178] According to Plaintiff, the only "donning" that took more than a matter of seconds was putting on his label container/canister which "if you were wearing a jacket or something" might take "one to two minutes" to adjust.[179] Plaintiff offers no evidence that any other potential class member had any such experience. In fact, witnesses universally testify that PPE/gear, to the extent used by purported class members (or some of them), took no more than a few seconds to grab or don.[180]

Further, employees who *did* use a locker (like Weller) testified that lockers were also used

---

[170]Ex. 1(G), Weller Dep. 139:12-24; 141:11-20.
[171]Plaintiff's own testimony is that walkie-talkies, when used, were kept in the office, not in lockers. Ex. 1(G), Weller Dep. 99:25-100:4. Thus, no evidence suggests that *any* employee was required to gather a walkie-talkie pre-shift.
[172]Motion, p. 22.
[173]"RTCs" (short for "Rolltainer Carriers," a type of small truck designed to carry 4 rolltainers at a time), pallet jacks and MUOPs are large pieces of equipment that could never fit in an employee locker (*see* Ex. 18, Delgado Decl. ¶17), and cannot be "donned" by an employee any more than an employee could "don" a car.
[174]*See* Ex. 1(G), Weller Dep. 143:13-16; *see also* Ex. 19, Ferguson Decl. ¶11 (2 seconds).
[175]*See* Ex. 1(G), Weller Dep. 143:17-19; *see also* Ex. 19, Ferguson Decl. ¶15 (a second).
[176]*See* Ex. 1(G), Weller Dep. 160:17-21; *see also* Ex. 19, Ferguson Decl. ¶22 (one second).
[177]*See* Ex. 1(G), Weller Dep. 151:3-10; Ex. 18, Delgado Decl. ¶7.
[178]*See* Ex. 19, Ferguson Decl. ¶15 (2 seconds); Ex. 18, Delgado Decl. ¶12 (3 seconds).
[179]*See* Ex. 1(G), Weller Dep. 142:25 – 143:11). Also, notably, the only other purported class members who testified to using a label container/canister stated that, while it was kept in the locker, it was not donned until after the Start Up Meeting (and thus presumably took only a second to grab pre-shift). *See* Ex. 3, Dengler Decl. ¶7.
[180]*See* Ex. 1(F), Summary Chart F.

to store personal items like cellphones and keys.[181] For these employees, the only time that is arguably compensable is the time spent donning (but not merely retrieving) required PPE/gear; the entire time spent at an employee's locker—including time spent unlocking it, opening it, and depositing personal items (such as coats, keys, purses, lunch boxes, etc.)—is not. Thus, to determine how much allegedly compensable time an employee spends "donning" gear (such that a determination could be made as to whether that time is *de minimis*) one would need to know, at a minimum, what gear an employee uses each day; whether that gear is kept in the employee's locker and, if so, what other items the employee keeps in her locker; whether gear retrieved from the locker; if any, is "donned" there, or merely grabbed; and whether the employee wears a jacket during work that may arguably slow down any "donning" time as Plaintiff alleges.

Assuming the facts as stated by Plaintiff, the activities he reports as a Full-Case Picker amount to *at most* 2 to 3 minutes per day, *but only if he was wearing a jacket* ("seconds" to throw headset around his neck and put box cutter in his pocket; and 1 to 2 minutes to don label canister when wearing a jacket). Other positions require substantially less time "donning" gear – normally a matter of seconds – if any at all.[182] Even Plaintiff testified that once he became a put-away driver, his 2-3 minutes of alleged "donning" time was reduced to "30 seconds."[183] Because of the variance in any otherwise allegedly compensable donning and doffing time, and the vast individualized proof needed to flesh out the same, the *de minimis* doctrine further counsels against certification.

#### 4. Premature Issuance of Notice Carries Irreversible Consequences

[181] *See, e.g.,* Ex. 1(G), Weller Dep. 141:11-19; Ex. 3, Dengler Decl. ¶7; Ex. 5, Garcia Decl. ¶9; Ex. 7, Harris Decl. ¶5; Ex. 10, Mast Decl. 4; Ex. 12, Minchuga Decl. ¶4; Ex. 13, Murry Decl. ¶4.

[182] *See* Ex. 1(D), Summary Chart D for a list of PPE and other equipment used by position; *see also* Ex. 1(F), Summary Chart F (Checkers have no donning time at all; Putaway Reach Operators spend a maximum of a few seconds throwing on safety glasses and slipping box cutters into their pockets, according to Weller's own testimony; and Pickers throw headsets around their necks (which takes a few seconds), but do not don any other gear until at their worksite. Accordingly, with the exception of Weller's testimony regarding his work as a Full Case Picker, there is *no* evidence that suggests that any donning activities take more than a few seconds).

[183] *See* Ex. 1(G), Weller Dep. 160:1-9.

The determination whether to authorize and facilitate FLSA collective action notice rests within the discretion of the district court and should only be authorized in "appropriate cases." *See Hoffmann-La Roche II*, 493 U.S. at 169. As a matter of sound case management, a court should, before authorizing notice, make a preliminary inquiry as to whether a manageable class exists. *See Diaz v. Elecs. Boutique of Am., Inc.,* No. 04-CV-0840E, 2005 WL 2654270, at *2-5 (W.D.N.Y. Oct. 17, 2005). At this stage, it is appropriate to consider whether proof of the merits will require so much individualized testimony as to make the case unfair or unmanageable.[184]

It is clear that this case is replete with individualized issues. Should the Court conditionally certify it now, it is likely to meet the fate of other decertified collective actions. Yet, once notice is issued to thousands of putative class members, the effects of that decision cannot be easily undone, even at the decertification stage, because the choice at that point will be whether to continue to proceed collectively or unleash potentially thousands of individual claims.[185]

This Court has previously decertified an FLSA class under very similar facts. *Lugo v. Farmer's Pride Inc. (Lugo II)*, 737 F. Supp. 2d 291, 292 (E.D. Pa. 2010). In *Lugo II*, after certifying a class of all hourly employees at the facility and allowing the parties to engage in discovery, the Court ultimately decertified the class based on evidence that "plaintiffs worked in different

---

[184] *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 586 (E.D. La. 2008) (when certification requires an employer "to pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the plaintiffs… [it] is tantamount to conducting multiple individual trials on the merits and is the antithesis of a collective action").

[185] For example, in 2004, the Northern District of Alabama ("NDAL") conditionally certified a class of Dollar General Store Managers on an FLSA exemption claim, only to decertify the class in 2006. The result was the conversion of a collective action into voluminous individual lawsuits, ultimately resulting in the transfer of more than 1,050 individual FLSA lawsuits from the NDAL to 56 other federal jurisdictions. *See Alice Gray, et al., v. Dolgencorp, Inc., et al.*; Civil Action No. 7:06-cv-01538 in the Northern District of Alabama, Western Division. In fact, 12 cases were transferred to the Eastern District of Pennsylvania following decertification. *See also Big Lots*, 561 F. Supp. 2d 567, 585 (E.D. La. 2008) (late-stage decertification of FLSA collective action class precipitated the filing of a number of individual claims from the decertified 936 plaintiffs who opted in); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 361 (D.N.J. 1987) (noting that the certification goal is to avoid the creation of "a monster that no one can deal with, made up with a lot of individual people with specific grievances"); *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) ("It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action . . . .").

positions and departments and on different shifts at defendant's plant, and that these positions and departments varied not only as to the PPE required and worn, but also as to the schedules followed" as well as differences in "individual routines and behavior." *Id.* at 304, 316. Importantly, the Court rejected the plaintiffs' argument that such individual differences would only be relevant to the determination of damages, explaining that these individual variations would preclude a class-wide finding on liability. *Id.* at 316–17. Moreover, the Court concluded that "representative testimony" from the named plaintiffs regarding their personal pre-shift and post-shift routines could not be imputed to the entire class due to the variation in departments and positions amongst the putative class members. *Id.* Other courts have conditionally certified classes involving similar claims only later to decertify the actions after determining that individualized determinations predominate.[186]

**5. The Nonexistence of Opt-Ins Weighs Against Certification**

Other than the named Plaintiff, not a single purported class member has opted in to Weller's proposed Collective Action Class. Plaintiff's counsel has publicized this suit on their website, detailing the nature of the specific claims at issue and inviting "employee[s] of Dollar General" who "believe [they] may have a claim for unpaid wages" to contact him telephonically or through the submission of an electronic form.[187] Weller himself testified that he has contacted potential class members about joining this suit and put them in touch with his attorneys.[188] However, despite this publicity, only Weller's consent has been filed. Courts have been extremely reluctant to

---

[186] *Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256, 1267 (N.D. Ala. 2012) (decertifying FLSA class because there was no common policy requiring employees to perform pre- and post-shift work without compensation; plaintiff's evidence that some employees chose to perform pre- and post-shift work without compensation cannot establish liability on a class-wide basis due to "variation in job duties and requirements at different [work] zones" and "variations in how plaintiffs' [work] zones were managed"); *see also Frye v. Baptist Memorial Hospital Inc.*, No. 07-2708, 2010 WL 3862591, at *4, 10 (W.D. Tenn. Sept. 27, 2010) (The court decertified the class, noting that because of the disparate factual and employment settings, proceeding collectively would result in unfairness to the Defendant and reduce judicial economy. Specifically, although the defendant had a uniform policy of applying automatic deductions for meal breaks, the "employees used various procedures to ensure they were compensated for time worked during meal breaks.")

[187] *See* http://www.axlergoldich.com/cases-investigations/dollar-general.

[188] Ex. 1(G), Weller Dep. 27:6 – 31:13.

conditionally certify massive nationwide classes alleging "off-the-clock" complaints under Section 216(b), especially when there are low numbers of individuals who have opted into the suit. Here, Plaintiff claims that Dollar General's rounding and donning and doffing policies have allegedly affected thousands of employees nationwide, and Plaintiff and his counsel have actively sought to find them. The fact that none have come forward evidences that Plaintiff's asserted claims are neither common nor widespread, and that a collective action (much less a *nationwide* collective action) cannot be justified.[189]

## C. The Court Should Deny Rule 23 Certification of Plaintiff's PMWA Claim

As a preliminary matter, given that Plaintiff has not met the more lenient standard for collective actions under the FLSA, he certainly has not met the higher standard imposed by Rule 23 and thus, for all the reasons set forth above, certification of his Rule 23 Class must be denied.

### 1. Applicable Legal Standard

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2550 (2011) (internal citations omitted). "In order to justify a departure from that rule, a class representative must . . . possess the same interest and suffer the same injury as the class members." *Id.* (internal citations omitted). All class action plaintiffs must demonstrate numerosity, commonality, typicality, and adequacy of representation.[190] These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 131 S.Ct. at 2550 (internal citations omitted). Because he seeks certification under Rule 23(b)(3), Plaintiff must also establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class actions is superior to other available

[189] Of course, even if Plaintiff were able to secure a large number of Opt-Ins (which he has not done), certification would still be inappropriate due to the other reasons set forth herein.
[190] Fed. R. Civ. P. 23(a).

methods for fairly and efficiently adjudicating the controversy."[191]

In deciding whether a plaintiff has met his burden, the court must engage in a rigorous analysis of the class proposal. *Dukes*, 131 S.Ct. at 2551. "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate . . . that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* "'Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence.'" *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 262 (3d Cir. 2011) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)). "Failure to meet any of Rule 23(a) or 23(b)'s requirements precludes certification." *Danvers Motor Co., Inc. v. Ford Motor Co.,* 543 F.3d 141, 147 (3d Cir. 2008). As the Third Circuit has held, if the court doubts the propriety of certification, it should not certify the proposed class. *Hydrogen Peroxide,* 552 F.3d at 321 (Third Circuit precedent "should not be understood to encourage certification in the face of doubt as to whether a Rule 23 requirement has been met").[192]

**2. The Class is Not Ascertainable**

Even before reaching the requirements of Rule 23(a), "as an essential prerequisite to class certification," a "plaintiff must show by a preponderance of the evidence that the class is ascertainable." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354–55 (3d Cir. 2013) (internal citations omitted). As the Third Circuit has explained, "ascertainability is important because it eliminates serious administrative burdens . . . by insisting on the easy identification of class

[191] Fed. R. Civ. P. 23(b)(3).

[192] Further, while Plaintiff claims that Third Circuit courts "routinely" certify classes alleging violations of Pennsylvania wage and hour laws under Rule 23 (*see* Motion p. 24), the cited cases are easily distinguished from the one now before the Court as all involve an entirely different analysis related to common proof. *See Verma v. 3001 Castor, Inc.*, CV 13-3034, 2016 WL 6962522, at *1-2 (E.D. Pa. Nov. 29, 2016) (Employer classified exotic dancers as independent contractors and did not pay them wages or overtime for performing. Common proof could establish that they were misclassified.); *Myers v. Jani-King of Philadelphia, Inc.*, No. 09- 1738, 2015 WL 1055700 (E.D. Pa. Mar. 10, 2015) (In class of allegedly misclassified janitors, there was a policy of making deductions that would be unlawful if the court decided janitors were indeed employees. Thus, class certification was appropriate.).

members; allows for the best notice practicable, and thereby protects absent class members; and protects defendants by clearly identifying the individuals to be bound by the final judgment." *Id.* at 355 (internal citations omitted). Ascertainability requires that: (1) the class "be defined with reference to objective criteria"; and (2) "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition" exists. *Id.* (internal citations omitted). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 593 (3d Cir. 2012).

Here, Plaintiffs' proposed Rule 23 Class consists of "all persons who have worked as a non-exempt, hourly employee" at the Bethel DC, regardless of position or job function (and thus encompassing anyone from a Human Resource Assistant – who does not use any PPE or specialized gear – to an operator of heavy machinery). Plaintiff claims that this broad class definition is warranted because all purported class members are subject to the same time-clock policies and allegedly engage in compensable work, such as donning and doffing of "required" PPE and other specialized gear, for which they are not paid.

**a. There is no Uniform Policy or Practice Requiring Pre- or Post- Shift Duties Across the Class**

Plaintiff has failed to establish an ascertainable class with respect to the alleged off-the-clock pre- and post- shift activities of gathering necessary equipment and donning and doffing any PPE or other specialized gear. Weller testified that *his* practice was to store items in his locker, don them in the locker room before clocking in and doff them in the locker room after clocking out.[193] However, as noted above, many purported class members make *no* use of PPE or other

[193] *See* Ex. 1(G), Weller Dep. 139:12-24; 184:12-16.

specialized gear,[194] and – among those who do – gear is varied and depends on the employees particular assigned task.[195] Further, PPE and other specialized gear may be stored in lockers, at the worksite, in an employee's vehicle or at their home, or in another location in the warehouse, past the clock at which employees clock in.[196] And, even when equipment is stored in an employees' locker, it may be donned *after* the start of the employee's shift.[197] The *only* proposed class member who has testified that he kept his equipment in his locker and donned it before clocking in and doffed it after clocking out is Weller. Plaintiff has pointed to no written policy that required him to keep items in his locker or to don them before the start of his shift; instead, the evidence supports that lockers were given to employees for convenience[198] and that many use their lockers to store personal items and not just work gear.[199] Some employees use their lockers, others do not.[200] Others have no locker, or gave up their assigned locker because they never used it.[201]

No policy ***requires*** all hourly employees to store PPE or equipment in a locker, or that employees don any PPE or gear before the start of his or her shift (or after the end of his or her shift). Employees simply must arrive at their worksite (or SUM) at the start of their shift, with the equipment in hand.[202] Thus, to determine if any other employees are owed time for donning and doffing activities, the Court would first need to determine: (1) which hourly employees use PPE or other specialized equipment; (2) what that equipment is; (3) how often it is used (if only for

---

[194]*See* Section III.B.2.a.1.d.i, *supra*; *see also* Ex. 1(H), Massey Dep. 144:13-145:2.

[195] *See* Ex. 17, Telford Decl. ¶14 (disposal mask used for specific projects only, and put on before use); Ex. 14, Nelson Decl. ¶7 (safety vest rarely used, and stored in her desk); Ex. 3, Dengler Decl. ¶9 (equipment use depends on task).

[196]*See* Section III.B.2.a.1.a, *supra*.

[197]*Id*; *see also* Section III.B.2.a.1.b, *supra*.

[198]*See* Ex. 1(H), Massey Dep. 112:2-7 ("If the employee so *chooses* to use it there are employee lockers available[.]") (emphasis added); 131:14-18 ("[T]he locker is provided if the employee wishes to use that space for their storage.").

[199]*See, e.g.*, Ex. 1(G), Weller Dep. 141:11-19; Ex. 3, Dengler Decl. ¶7; Ex. 5, Garcia Decl. ¶9; Ex. 7, Harris Decl. ¶5; Ex. 10, Mast Decl. 4; Ex. 12, Minchuga Decl. ¶4; Ex. 13, Murry Decl. ¶4.

[200]*See* Ex. 9, S. Kreiser Decl. ¶4 (never uses locker).

[201]*See* Ex. 4, Fusselman Decl. ¶6; Ex. 6, Hare Decl. ¶10; Ex. 8, R. Kreiser Decl. ¶13; Ex. 14, Nelson Decl. ¶10.

[202]*See, e.g.*, Ex. 1(H), Massey Dep. 130:18-131:4 (regarding when employees are to don equipment, "they would be expected to have it when they start working, when they are staring work in their work area[.]")

particular tasks); (4) where it is stored (if at home or in the vehicle, donning and doffing is not compensable; if at the worksite, donning and doffing necessarily occurs on the clock); (5) if it *is* stored in a locker, when the employee accesses his locker to retrieve it; and (6) if stored in a locker, when and where the employee actually puts it on. None of the questions can be answered with common proof (particularly questions 4-6) and mini trials would be required to determine which employees have uncompensated donning and doffing time, if any at all.

**b. Dollar General's Rounding Policies are Lawful and Plaintiff does not Identify an Ascertainable Class Related to this Policy**

Likewise, there is no ascertainable class related to Plaintiff's rounding claims. As discussed above, Dollar General's policy is lawful, as rounding to the nearest quarter hour is expressly permitted by the DOL provided that "employees [are] properly [paid] for all the time they have actually worked." 29 C.F.R. § 785.48(b). The DOL also recognizes that the time period during which an employee is clocked-in does not necessarily equate to the time that the employee spent performing compensable work. *See* 29 C.F.R. § 785.48(a). For example, its regulations explain that time spent "walking from time clock to work bench" and other preliminary or postliminary activities need not be compensated. *See* 29 C.F.R. § 785.34 ("[T]raveltime at the commence or cessation of the workday . . . (such as . . . *walking from time clock to work bench*) need not be counted as working time[.]").[203]

Thus, Plaintiff's "expert" conclusion that Dollar General's rounding policy has resulted in employees being compensated for an average of 20 hours less than those employees were clocked in is insufficient to establish a violation of the FLSA or corresponding state law. Instead, a determination of the merits of each individual's overtime claim would require an assessment of

[203] *See also* 29 C.F.R. § 790.7(g) ("Other types of activities which may be performed outside the workday and . . . would be considered 'preliminary' or 'postliminary' activities, *include checking in and out* and waiting in line to do so, changing clothes, washing up or showering, and waiting in line to receive pay checks.") (emphasis added).

their pre- and post- shift routines—not just when they clocked in or out (as records could demonstrate) but, instead, what they did after clocking in and before clocking out. Did they socialize with coworkers, walk to their workstations and put away personal items (as Defendant's declarants have variously testified) or did they perform compensable work (and if so, how much?) as Plaintiff (and only Plaintiff) claims to have done? There are no records or other common proof that could provide an answer to the question if what employees did after clocking in (and before the start of their shift) or before clocking out, which instead would require mini trials to answer. For this reason, the class is not ascertainable and certification must be denied.

**3. Individual Issues Predominate and a Class Action is Not Superior**

Class certification is also inappropriate under Rule 23(b)(3) because "questions of law or fact common to class members" do not "predominate over questions affecting only individual members" and a class action is not superior to other methods to fairly and efficiently adjudicating this controversy. *See* Fed. R. Civ. P. 23(b)(3). The predominance requirement of Rule 23(b)(3) requires that proposed class members are sufficiently cohesive to warrant class adjudication. *Hydrogen Peroxide*, 552 F.3d at 310-311. If a determination of liability requires individualized proof, class certification is not suitable. *Id.* Further, damages must be "capable of measurement on a classwide basis" such that "individual damage calculations will [not] inevitable overwhelm questions common to the class." *Comcast v. Behrend*, 133 S. Ct. 1426, 1432-33 (2013). While Plaintiff cursorily states that the claims of all class members "stem from the same evidence [and] require the same proofs," this could not be further from the truth.

Here, Plaintiff claims that Dollar General's "7-minute rules . . . in conjunction with the records of time rounded uniformly by the Kronos system, are common evidence of DG's systemic, class-wide policy and practice of not paying employees for actual hours worked."[204] The primary

[204] Motion, p. 36.

flaw in this argument is that it presumes, without proof, that rounded time is compensable. As discussed in detail above, on-the-clock time does not equate to time worked, and thus Plaintiff's suggestion that clock-in clock-out records provide "common proof" is simply incorrect.[205] Plaintiff ignores his need to prove that other class members engaged in pre- or post-shift compensable work and that the rounding policy had the effect of denying them compensation for that work. No common evidence would be able to do so. Instead, because there was no common policy or practice related to employees' pre-shift practices, post-shit practices or meal break routines, it is impossible to determine liability without individualized proof. The claims of the purported class members, if any, stem from different evidence and require different proof.

**4. Plaintiff Has Not Proven the Rule 23(a) Requirements are Satisfied**

**a. There are No Common Answers to Common Questions**

Rule 23(a)(2) also requires "questions of law or fact common to the class."[206] In *Dukes*, the Court explained that a common contention is insufficient to meet this standard; instead, the contention must be "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[207] Thus, commonality requires not just common questions—but common questions with common answers. If which putative class members are called to testify will affect the outcome of the litigation, the case cannot be tried on a representative basis.

As discussed above with respect to the predominance and ascertainability inquiries, there is no common answer that will resolve classwide liability. Even if Plaintiff could prove that he engaged in work that was not compensated, that proof is unique to him. Plaintiff has not presented evidence regarding how other class members were impacted by any allegedly common policies.

---

[205] *See, e.g.*, Ex. 1(B), Summary Chart B, Column A (summarizing testimony regarding non-compensable, pre-shift activities that may occur *after* clocking in); *see also* Section III.B.2.b.2, *supra*.

[206] Fed. R. Civ. P. 23(a)(2).

[207] *Dukes*, 131 S.Ct. at 2551.

### b. Typicality and Adequacy have Not Been Established

Rule 23(a)(3) requires that the claims of the representative parties be "typical of the claims or defenses of the class" and Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class."[208] "Typicality" analysis addresses three related concerns: (1) the legal theory and factual circumstances underlying the class representatives claims must be generally the same as those of the class; (2) the class representative must not be subject to a defense that is inapplicable to many members of the class and likely to become a major focus on the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.[209] "Adequacy" requires proof that Weller "has the ability and the incentive to represent the claims of the class vigorously ... and that there is no conflict between the individual's claims and those asserted on behalf of the class."[210]

Plaintiff cannot prove typicality or adequacy for the same reasons he cannot prove ascertainability, predominance or the existence of common questions. Plaintiff has no testimony of other purported class members from the Bethel DC—let alone from the others that he seeks to include in the class—and has not produced any evidence that shows he and other employees are similarly situated in their use of PPE or their pre- and post- shift activities, as required for certification. *See Jackson v. Se. Pennsylvania Transp. Auth.*, 260 F.R.D. 168, 188 (E.D. Pa. 2009) ("A plaintiff must produce evidence usually in the form of affidavits, statistical evidence, or both, tending to show that the individual claims share questions of fact or law with the class claims and that the individual claims are typical of those brought for the class.") (internal citations omitted). Because Plaintiff has not demonstrated he is "typical" of the class, or can adequately represent the interests of a disparate group of workers, certification should be denied.

---

[208] Fed. R. Civ. P. 23(a)(3), (4).
[209] *In re Shering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).
[210] *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988).

**D. Plaintiff's Derivative Claims Should Not be Certified**

Plaintiff's claim for violation of the WPCL is wholly derivative of his FLSA and PMWA Claims and thus should be denied for the same reasons as those stated above in relation to the underlying claims. Pennsylvania courts are clear that "[t]he WPCL does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." *Hirsch v. EPL Techs., Inc.,* 2006 PA Super 293, ¶ 9, 910 A.2d 84, 88 (2006). Because a WPCL claim is not freestanding, and Plaintiff has not demonstrated that a certifiable class exists in relation to his substantive claims, certification of WPCL class inappropriate.

Certification of Plaintiff's unjust enrichment claim should likewise be denied for the same reasons as those detailed above related to: Plaintiff's failure to identify a common unlawful policy, his failure to name an ascertainable class; and his inability to adequately represent a class of employees of which he is not typical. In Pennsylvania, the elements of unjust enrichment are: "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Mitchell v. Moore*, 1999 PA Super 77, ¶ 8, 729 A.2d 1200, 1203 (1999). A determination of liability "depends on the particular factual circumstances of the case at issue." *Id.* at 1202. Even assuming that an employee could maintain a claim for unjust enrichment for his employer's failure to pay him for time worked, a class could not be certified here because, as discussed in detail above, there is no common proof that Dollar General's employees were required or permitted to perform work for which they were not compensated. Thus, certification of Plaintiff's unjust enrichment claim must be denied.

## IV. CONCLUSION

Based on the foregoing, Plaintiff's Motion must be denied.

Dated October 18, 2018

Respectfully submitted,


________________________________

Joel S. Allen (*Pro Hac Vice*)
Texas Bar No. 795069
jallen@mcguirewoods.com
Melissa M. Hensley (*Pro Hac Vice*)
Texas Bar No. 00792578
mhensley@mcguirewoods.com
McGuireWoods LLP
2000 McKinney Avenue
Suite 1400
Dallas, Texas 75201
Telephone: 214.932.6400
Facsimile: 214.932.6399

________________________________

Joseph L. Gordon
Pa. Bar No. 209075
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
1818 Market St., Suite 3402
Philadelphia, PA 19103
jlg@pietragallo.com
Telephone: 215-320-6200
Facsimile: 215-754-5181


ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

On the 18th day of October, 2018, a true and correct copy of the foregoing was caused to be served upon to the following attorneys of record through the Court's CM/ECF system:

Noah Axler
Marc Goldich
Axler Goldich LLC
1520 Locust Street, Suite 301
Philadelphia, PA 19102
naxler@axgolaw.com
mgoldich@axgolaw.con

Mitchell L. Paul
1845 Walnut Street, Suite 1199
Philadelphia, PA 19103
mpaul@paullaw.net

Samuel A. Dion
Dion & Goldberger
1845 Walnut Street, Suite 1199
Philadelphia, PA 19103
samueldion@aol.com

Joel S. Allen

106819095_10