**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTOPHER WELLER, on behalf of** | : | |
| **himself and all others similarly situated** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.   17-2292** |
| | : | |
| **DOLLAR GENERAL CORPORATION;** | : | |
| **DOLGENCORP, LLC** | : | |

**<u>MEMORANDUM</u>**

**SCHMEHL, J.   /s/ JLS**                                          **MARCH  2, 2022**

Plaintiff brought this proposed Amended Collective and Class Action Complaint

individually and on behalf of others similarly situated against Defendants Dollar General

Corp. and Dolgencorp, LLC. (collectively, "DG"). Plaintiff alleges that the suit is brought

"on behalf of current and former distribution center employees of a nationwide chain of

retail stores owned and operated by Defendants to recover unpaid regular and overtime

wages as well as all other available relief pursuant to the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201, et seq., the Pennsylvania Minimum Wage Act of 1968

("PMWA"), 43 P.S. § 333.101, et seq., the Pennsylvania Wage Payment and Collection

Law ("WPCL"), 43 P.S. § 260.1, et seq., and the law of unjust enrichment." Am. Comp.

¶ 1. Presently before the Court is the Plaintiff's Motion to Certify Class and Conditional

Class Action. The Court has held oral argument on this motion. For the reasons that

follow, the motion is denied.

Plaintiff claims that "Defendants have systematically and intentionally violated

applicable federal and state laws by, among other things, applying common policies to

their employees which deprive them of regular and overtime wages. These policies,

**1**

which deprive Defendants' distribution center employees- including Plaintiff- of regular and overtime wages, include:

a. applying a time clock rounding policy which purports to round employee time to the nearest 15-minute increment but systematically results in under-recording the actual time worked on the clock by distribution center employees;

b. applying a time clock rounding policy which rounds employee meal break time to the nearest 15-minute increment which systematically results in under-recording the actual time worked by distribution center employees (for example, an employee who takes a 25-minute lunch and returns to work is charged with having a 30-minute lunch, thus losing 5 minutes of work time);

c. requiring distribution center employees to clock in seven minutes before the start of their shifts which, in conjunction with the rounding policy, contributes to the systematic under-recording of the actual time worked on the clock by employees; and

d. failing to pay distribution center employees for time spent donning and doffing protective gear and other pre-shift, post-shift, and meal break work that is more than de minimus and performed for Defendants' benefit.

Am. Comp. at ¶ 3.

Plaintiff is the only named plaintiff in this case. Despite the completion of significant class discovery, no other putative class members have submitted consent forms or a declaration in support of Plaintiff's allegations. Instead, Plaintiff relies solely on his own testimony, DG Employee Handbooks and Supplements thereto, and his expert's analysis of the time records from 73 randomly chosen putative class members from DG's Bethel Distribution Center. DG, on the other hand, has submitted 16 declarations from putative class members, a number of charts summarizing the contents of the declarations, its own expert report and the testimony of its Rule 30(b)(6) designee, Carey Massey ("Massey"), the Director of DG's Supply Chain Human Resources. Although Plaintiff characterizes these declarations as self-serving, Plaintiff has not submitted a single counter-declaration.

**PROCEDURAL HISTORY**

This case has had a drawn-out procedural history. Plaintiff filed the Original Complaint on May 18, 2017 (ECF 1). DG filed an Answer on June 19, 2017 (ECF 5). Following a Rule 16 conference on August 3, 2017, the Court ordered, *inter alia*, that all discovery was to be completed by February 1, 2018 and that Plaintiff was to file a motion for conditional certification under the FLSA and a motion for class certification of the state claims by that same date (ECF 15). Following a status conference on December 18, 2017, the Court amended its previous order and directed that initial liability discovery shall be completed by March 9, 2018 and that Plaintiff was to file his motion for class certification by April 1, 2018 (ECF 17). Following a telephonic status

conference on February 7, 2018, the Court directed the parties to submit a proposed scheduling order by no later than March 13, 2018 (ECF 19). By Order filed on April 12, 2018, the Court directed that all discovery related to Plaintiff's class certification motions was to be completed by no later than June 1, 2018, and that the class certification motions and expert reports were to be filed by July 2, 2018 (ECF 21).

On May 23, 2018, the parties stipulated, with Court approval, that Plaintiff could file an Amended Collective and Class Action Complaint against DG. Plaintiff filed his Amended Complaint on May 23, 2018 (ECF 22).

On May 31, 2018, the parties stipulated, with Court approval, that all discovery related to Plaintiff's class certifications was to be completed by July 16, 2018 and that Plaintiff's conditional and class action certification motions, as well as expert reports, were to be filed by August 16, 2018 (ECF 24). On June 6, 2018. DG filed an Answer to the Amended Complaint (ECF 26).

On August 16, 2018, the Plaintiff filed a Motion for Class Certification of the state law claims and for Conditional Class Action Certification of the FLSA claim (ECF 35). Counsel for DG subsequently visited DG's Distribution Center in Bethel, Pennsylvania where counsel interviewed various putative class members, and obtained declarations from 16 of them to support DG's opposition to Plaintiff's Motion for Class Certification. DG also obtained declarations from four supervisors. DG then filed its opposition to the motion for class certification on October 18, 2018 (ECF 45). Attached to the opposition were the 16 declarations from hourly employees at the Bethel Distribution Center (who were also putative class members for both the proposed FLSA collective and Rule 23 classes), charts summarizing information provided by the declarants, and four

declarations from certain supervisory employees at Bethel Distribution Center (ECF 45, Exs. 1B-1F, 3-18).

Claiming that DG had failed to identify any of the 20 declarants in its initial disclosures or supplements to its disclosures and had communicated with unrepresented putative class members prior to class certification, Plaintiff subsequently filed a Motion to Strike and for Sanctions against DG (ECF 47). The Court referred the Motion to a Magistrate Judge (ECF 56).

In a Report and Recommendation ( "R & R"), dated March 4, 2019, the Magistrate Judge concluded that DG "improperly communicated with the putative class members before certification was decided" and imposed sanctions, including allowing Plaintiff to depose the declarants and any other hourly employees interviewed by DG's counsel and ordering DG to pay costs and expenses relating to such depositions (ECF 63). The Magistrate Judge concluded that the ex parte communications violated Pa. R.P.C. 4.2 (lawyer "shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so") and E.D. Pa. Civ. P. 83.6 IV.B (adopting Pennsylvania Rules of Professional Conduct as Rules of Professional Conduct in the U.S. District Court for the Eastern District of Pennsylvania) (ECF 63). Following Objections to the R & R by DG, this Court remanded the matter to the Magistrate Judge for the purpose of conducting an evidentiary hearing under the Supreme Court's decision in *Gulf Oil Co. v. Bernard,* 452 U.S. 89 (1981)[1] (ECF 76).

---

[1] In *Gulf Oil,* the Supreme Court addressed the question of whether district courts possess the authority to limit communications between parties and prospective class members. The Court held that "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with

In connection with the *Gulf Oil* hearing, the Magistrate Judge permitted the

Plaintiff to select and depose four of DG's 16 declarants. All four declarants testified that

the statements made in their declarations were truthful and were not made under

duress. ECF 100-4, Deposition of Raymond Garcia at 24:13–25:3, 68:15–69:13, 75:13–

76:14;74:11–17; ECF 100-5, Deposition of Gabriel Telford at 61:19–62:1;ECF 100-6,

55:7–19, 58:23– 59:20, 61:15–18 Deposition of Steven Rivera-Vega  at 76:11– 77:4;

78:19–79:7, 79:17–81:9; ECF 100-7, Deposition of Patrick Shaud at 29:13–7, 40:6–20.

11:6–8, 43:5–44:3. On the eve of the *Gulf Oil* hearing, Plaintiff voluntarily withdrew the

motion for sanctions. (ECF 91). The Magistrate Judge subsequently ordered further

briefing on the class certification issue and permitted Plaintiff to take the depositions of

an additional four of DG's Declarants (ECF 91). Plaintiff elected not to do so.

**FACTS**

DG is a discount retailer of consumable goods with approximately 15,000

locations in the United States. ECF 45-9, Massey Dep. at 29. The retail locations

receive their goods from DG's 15 Distribution Centers which are located throughout the

country. *Id*. at 26-28. Plaintiff worked at the Distribution Center located in Bethel,

Pennsylvania from August 24, 2015 to March 16, 2017 as a "Picker" and as a "Put-

Away driver." ECF 45-8, Weller Dep. at 27-28.

According to the Senior Human Resources Manager at the Bethel location, the

Bethel Distribution Center is just under one million square feet in size and employs over

500 hourly employees. ECF 45-30, Zappacosta Decl. at ¶¶ 5,6. A set of lockers and an

---

the rights of the parties." 452 U.S. at 100. The Court went on to explain that "such a weighing-identifying
the potential abuses being addressed-should result in a carefully drawn order that limits speech as little
as possible, consistent with the rights of the parties under the circumstances." *Id.* at 102.

employee break room are located on the second floor. ECF 45-9, Massey Dep. at 111-112; ECF 45-8, Weller Dep. at 139. Many of the hourly employees take a flight of stairs down from the locker room to a row of time clocks in the shipping, receiving and repack areas, where the hourly employees clock in before walking to their workstations in the distribution center. *Id*. Maintenance workers have a second set of lockers located within the maintenance department on the warehouse floor, which are located on the other side of the time clocks and are accessed only after clocking in. ECF 45-12, Dengler Decl. at ¶ 8. The length of time it takes for an hourly employee to walk from the time clocks to his department depends on the location of the department in the Distribution Center. Compare ECF 45-20, Mehler Decl. at ¶ 8 (30 second walk from time clocks to equipment room) with ECF 45-18, S. Kreiser Decl. at ¶ 5 (four to five-minute walk from time clocks to his department).

Hourly employees at the Distribution Center include the general warehouse worker group as well as such support functions as human resources, inventory control, warehouse management systems, shipping and receiving clerks. ECF 45-9, Massey Dep. at 36-37.

The general warehouse worker group consists of the Receiving Department where "Checkers" "check in the merchandise that comes in on the trailers. They verify the inventory is correct and make sure everything gets wrapped." ECF 45-8, Weller Dep. at 99. Checkers "use box cutters and handheld devices, as well as walkie-talkies." *Id*. The Checkers kept their handhelds and box cutters in their lockers. *Id*. at 100. The walkie-talkies were kept in the office. *Id*. Checkers do not use any personal protection

equipment ("PPE"). ECF 45-13, Fusselman Decl. at ¶¶ 4, 6; ECF 45-18, S. Kreiser Decl. at ¶ 8.

Besides "Checkers," another group in the Receiving Department are "Stockers" who are "responsible for stocking any of the merchandise that needs to be stocked that they're not currently picking." ECF 45-8, Weller Dep. at 100. Stockers use box cutters and gloves which they keep in their lockers. *Id*.

Finally, in the Receiving Department are "Put-Away Drivers" or "Lift Drivers" who operate a fork-lift and transport the checked-in merchandise to areas of the distribution center where it will be stored. *Id*. at 121. Put-Away Drivers wear safety glasses. ECF 45-13, Fusselman Decl. at ¶ 12; ECF 45-19, Mast Decl. at ¶¶ 12-13.

In the Full-Case Department, "Order Pickers" "pick[ed] the merchandise up off the shelves with an electric pallet jack." ECF 45-8, Weller Dep. at 108. Order Pickers also drive a rolltainer carrier which is a piece of equipment that pulls rolltainers. ECF 45-9, Massey Dep. at 127. A rolltainer is a tall, oblong screened cart that is rolled onto a trailer where it is delivered to a specific store. *Id*. "Replenishment Drivers" "would pull down any pallets to put back in stock for the Pickers, in case any of the merchandise ran out." ECF 45-8, Weller Dep. at 108-109. These Drivers would wear safety glasses. ECF 45-13, Fusselman Decl. at ¶ 12; ECF 45-19, Mast Decl. at ¶¶ 12-13.

In the Repack Department, workers would take full cases of merchandise and "break them down into single items or single packs" to be shipped to the various stores. ECF 45-8, Weller Dep. at 93-94. Some of the workers in the Repack Department used a MUOP "which was like a cherry picker that would let them go up and down, because they had to go higher on different levels and down on lower levels." *Id*. at 94. These

workers also used a safety harness, safety glasses and gloves. *Id*. at 115. Some of the workers kept the safety harness in their lockers while others kept it in their work area. Although the workers were supposed to keep the box cutters and gloves in their lockers, some kept these items on themselves. *Id*.

In the Shipping Department are "Loaders" who load cases of out-bound merchandise into trailers. ECF 45-9, Massey Dep. at 127. The Loaders use box cutters, gloves and a headset which they keep in their lockers. ECF 45-8, Weller Dep. at 117. Some employees kept these items on their person. *Id*. Also present in the Shipping Department are "Yard Drivers" who move trailers in and out of dock doors as necessary. ECF 45-9, Massey Dep. at 166-167. A Yard Driver must wear a fluorescent shirt or yellow vest or has the option of wearing a raincoat. ECF 45-17, R. Kreiser Decl. at ¶¶ 6-10. Kreiser further declared that he is permitted to take the shirt and vest home and that he takes the shirt home to be washed but keeps the vest in his car. *Id*. at ¶¶ 8-9.  If he elects to wear the vest instead of the shirt, Kreiser dons the vest while walking through the parking lot. *Id*. at ¶ 9.

DG's Employee Handbook provides:

> Compensation for hourly employees is determined by the pay rate and number of hours the employee works each week. By using the Company timekeeping system, an *accurate account of the hours* you work will be recorded. Hourly (non-exempt) employees must record all hours they work by clocking in and out on the Company timekeeping system. Employees are *required to clock in when they start to work* each day, clock out and in before and after any break of 30 or more minutes, and clock out at the end of their work day.

ECF 36-3, 2013 DG Employee Handbook, at 8 (DG-WELLER-000365-419, at 378) (emphasis added)

The Distribution Center Employee Handbook Supplement for 2013-

2015 states:

> Clocking in and out provides an *accurate recording of hours
> worked* so that employees may be paid properly. Employees
> are *required to "clock in/out" when they start to work*, before
> and after their meal period and at the end of their work shift.

ECF 36-8, 36-9, 36-10, 2013-2015 DG Distribution Center Employee Handbook

Supplement, at 2 (DG-WELLER000420-427, at 422, (DG-WELLER000554 - 561, at

556); Ex. 10, 2015 DG Distribution Center Employee Handbook Supplement, at 2

(DGWELLER-000690 - 698, at 692).) (emphasis added)

DG prohibits employees from working "off the clock." Specifically:

> "Working off the clock" means working, but not reporting on
> the timekeeping system, the hours you worked. Working off
> the clock, or allowing or instructing someone to work off the
> clock, is a violation of Company policy and can lead to
> immediate termination from the Company even for the first
> offense. Employees must be paid for all hours worked. In
> addition, you must be paid for all hours worked within the
> week the hours were actually worked. Hours cannot be
> intentionally held over to another week for payment. No
> employee in the Company, including your manager, has the
> authority to require you to work off the clock or falsely report
> hours as having been worked in a week other than when they
> were actually worked.

*Id.*

Massey testified that all hourly distribution center employees are required to use

the Kronos time clock system ("Kronos"). ECF 36-2 at 38-39. According to Massey,

Kronos rounds employee time by rounding the clock-in time at the start of the day to the

nearest quarter hour and by rounding the clock-out time at the end of the day to the

nearest quarter hour. *Id.* at 39. She further testified that the punch-out time for an

employee's 30-minute meal break as well as the employee's punch-in time are rounded

collectively to the nearest quarter hour. *Id*. Massey clarified that the clock-in and clock-

out times for the 30-minute meal break are not rounded individually like the initial clock-

in and clock-out times for the day. *Id. at 45-47*. Rather, the **total** time clocked out for

meal breaks is rounded to the nearest quarter hour increment, e.g., a 25-minute meal

break is rounded up to 30 minutes. *Id.* at 45. Massey summed up the rounding policy as

follows:

> The clock-in time will be rounded to the nearest quarter hour,
> meaning at the start of the day. The clock-out time at the end
> of the shift is rounded to the nearest quarter hour. The punch-
> out time for your 30-minute break and the punch-in time for
> your 30-minute break are rounded collectively to the nearest
> quarter hour.

ECF 36-2 at 47-48. The rounded meal time is then subtracted from the total time

between the initial clock-in time, as rounded, and the final clock-out time, as rounded, to

arrive at the total punched for the day. *Id*.

In addition, the Distribution Center Handbook Supplements for 2013, 2014 and

2015 all state:

> Employees should clock in no earlier than seven (7)
> minutes prior to their starting time, while still allowing
> themselves enough time to be at their work stations by
> their scheduled start time. Likewise, employees should
> clock out no later than seven (7) minutes past the end
> of their work time unless overtime has been authorized.
> Employees generally are expected to leave the
> distribution center premises within 15 minutes after
> clocking out at the end of their shift.

Case 5:17-cv-02292-JLS   Document 108   Filed 03/02/22   Page 12 of 43

ECF 36-8 at 2, 36-9 at 2, 36-10 at 2.

The Bethel Distribution Center further distributes a guide to all newly hired employees which states under the heading Tracking Work Time, *inter alia*, that employees are responsible for clocking in and out (SWIPE) which includes "Clock/Swipe in no earlier than 7 minutes **prior** to starting time and Clock/Swipe out no later than 7 minutes **past** the end of their work time. ECF 36-12 at DG-WELLER 1067. (emphasis in original).

An excerpt from an orientation Power Point states: "**PRO TIP**:-7 minutes=Good Swipes-Clock/Swipe in no earlier or later than 7 minutes." ECF 36-14 at DG WELLER-000352.

Plaintiff testified that the 7-minute clock-in rule was also conveyed verbally to all distribution center employees. ECF 36-11, Weller Dep., at 17:11-22, 128:1-9, 135:2-11, 239:5-9 (testifying that employees were reprimanded if they clocked in before 7 minutes prior to the start of a shift), 241:6-10 (testifying that employees are considered late if they clock-in after 7 minutes prior to the start of a shift), 242:1-4 (testifying that there was no way for a distribution center to clock-in 7 minutes after the start of a shift without being reprimanded).

On the other hand, Massey testified that having hourly employees clock-in no earlier than 7 minutes prior to their starting time is a "best practice" at DG, not a policy. ECF 45-9, Massey Dep. at 70. Indeed, many of the declarants averred that they clock in anywhere from 1 to 7 minutes before their shift starts. ECF 45-12, Dengler Decl. at ¶ 9

(6 minutes early); ECF 45-15, Hare Decl. at ¶ 11 (arrives as to close to start of shift as possible, normally 1-2 minutes before start of shift); ECF 45-16, Harris Decl. at ¶ 7 ("just a few minutes" before shift start); ECF 45-18, S. Kreiser Decl. at ¶ 5 (usually 4 minutes early).  In addition, the Kronos system does not prevent employees from clocking in more than 7 minutes prior to the start of a shift. ECF 45-29, Cullins Decl. at ¶¶ 11-13 (detailing four instances where hourly employee Cara Pokrop clocked in 8 minutes before start of shift and had her time rounded down in her favor; three instances where hourly employee Charles Witman clocked in 8 minutes before the start of his shift and had his time rounded down in his favor; three instances where hourly employee Edgar Santiago clocked in 8 minutes before start of shift and had his time rounded down in his favor.). and ECF 45-30, Zappacosta Decl. 3-4 (these employees were not disciplined).

Plaintiff testified that, "each day, after punching-in, [Plaintiff] and distribution center employees were required to gather supplies, operate power equipment, and travel across the warehouse floor to a mandatory "start-up meeting" where, among other things, the employees must receive instruction from supervisors, go over shift volume, and perform a daily equipment checklist." ECF 36, Weller Dep. at pp 18-19. Plaintiff contends that these actions constitute actual work for which the putative class members are not compensated due to DG's rounding policy. Plaintiff testified that the start-up meetings began before the scheduled shift time and if an employee failed to clock in early and instead clocked in when their shift started, they were considered late to the start-up meeting and verbally reprimanded. ECF 36-11, Weller Dep. at 167-168, 257, 259-260.  Plaintiff testified that in order to clock-in 7 minutes before his shift started

at 7:00 a.m., he had to arrive at work approximately 20 to 30 minutes prior to when his shift began. ECF 36-11, Weller Dep. at 145.

Although Plaintiff testified that the start-up meetings began before the scheduled shift time, many of the 16 declarants averred that they either do not attend start-up meetings (because their position does not require a start-up meeting) or that the start-up meeting always begins *after* the start of a shift and never before. ECF 45-3, Column C.

Although Plaintiff testified that the hourly employees engaged in actual work after they clocked-in but before their shift began, many of the 16 declarants averred that they never performed any job duties between the time they clocked-in and the start of a shift/start-up meeting. ECF 45-3, Column B.

Many of the 16 declarants averred that they used the time between clocking-in and the start of their shift for walking anywhere from 90 seconds to 4 to 5 minutes from the time clocks to their work station, chatting with co-workers, saying hello to the secretary, picking up gear or accessing their lockers. ECF 45-3, Column A.

Plaintiff also testified that DG has a policy that requires its hourly employees to go to an employee locker room and don and doff PPE and other gear before clocking in as well as after clocking out and during unpaid meal breaks. ECF 36-11, Weller Dep. at 14-15; 40-41. According to Plaintiff, all hourly employees were required to keep their gear and equipment (headsets, box cutters, label containers, pallet jacks, walkie talkies, gloves, safety goggles) stored in their lockers which were in a locker room that was

separate from the warehouse floor. *Id*. at 128. Hourly employees were not permitted to take any gear or equipment off the distribution center premises. *Id*. at 104-106. Before employees were permitted to clock-in 7 minutes prior to the beginning of a shift or coming back from a break, the employees had to retrieve their equipment from their lockers. *Id.* at 139; ECF-36-2, Massey Dep. at 150. Following their shifts and after clocking-out, hourly employees were required to return to the locker room to doff their safety gear. ECF 36-11, Weller Dep. at 41-42.

Although DG provides lockers to its employees, it does not appear to maintain a uniform policy requiring employees to store their PPE/gear in lockers. ECF 45-9, Massey Dep. at 112 ("If the employee so chooses to use it there are employee lockers available[.]"); id. at 131 ("[T]he locker is provided if the employee wishes to use that space for their storage. I'm sure there's cases where they don't use it, I can't say where every stocker is going to store that equipment or those items"); see also, ECF 36-1, DG's Amended and Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories, at 26 ("The Bethel Employees are not required to store any equipment in the personal locker.") Some employees store their equipment in their personal lockers, while other do not. Some elect to have no locker at all. ECF 45-18, S. Kreiser Decl. at ¶ 4 (never uses locker). ECF 45-17, R. Kreiser Decl. at ¶ 13; ECF 45-23, Nelson Decl. at ¶ 10. Indeed, "Dollar General does not require the Bethel Employees who use safety goggles, cut-resistant gloves, and/or cut-resistant sleeves to put on such equipment at a specific location. Dollar General requires the Bethel Employees who use fall protection equipment (i.e. harness and lanyard) and/or high visibility vests to put on such equipment in their work area (which would occur after swiping in)." ECF 36-1,

DG's Amended and Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories, at 26-27; ECF 45-9, Massey Dep. at 130-131. Some employees take their PPE/gear home. ECF 45-16, Harris Decl. at ¶ 5 (permitted to take cut-resistant sleeve and glove, a box cutter, and a sharpie home); ECF 45-21, Mingucha Decl. at ¶ 5 (could take DG's Velcro belt home if he wanted to); ECF 45-20, Mehler Decl. at ¶ 4 (can take his personally bought safety glasses home if he wants to, but keeps them in locker for convenience).

In addition, there appear to be substantial variances in the hourly employees' donning and doffing practices. For example, a Repack Picker (Murry) averred that she dons belt at her work area, dons her headset when she starts picking and doffs these items before lunch and at the end of her shift in her work area. ECF 45-6. A Put Away Driver/Full Case Replenishment Driver (Garcia) averred that he donned safety glasses only when operating a vehicle. *Id*. A Stocker (Harris) averred that he donned glove and sleeve after the start-up meeting concluded in his work area and then doffed these items in his work area before meal break. *Id*. A Picker (Delgado) averred that Pickers generally don optional gloves, optional aprons, belts and headsets during or after the start-up meeting. *Id.* An MUOP driver (Mast) averred that he dons his harness after the start-up meeting, but before operating the MUOP and doffs his harness on the MUOP before meal break and at end of shift while in work area. *Id.* A Full Case Picker (Mehler) averred that he donned and doffed his headset and cannister in his work area and did not store either item in his locker. *Id.* The Court could go on. DG's chart reveals that there are substantial variances among the hourly employees' donning and doffing practices. ECF 45-6.

There also appears to be a wide variation among the hourly employees in the type of PPE and specialized equipment they use. For example, Checkers and Pickers do not use any PPE. A Putaway Driver uses safety glasses and box cutters. A Loader uses box cutters, gloves and a headset. A Yard Driver uses a Fluorescent shirt or vest or an optional raincoat. A Picker in the repack Department uses a headset, voice box, optional belt, optional apron and optional gloves. ECF 45-5.

As for meal breaks, Plaintiff claims that DG disciplines employees who are even 1-minute late returning from the lunch break. "Employees are expected to be punctual in starting and ending their breaks." Ex. 3, 2013 DG Employee Handbook, at 12 (DG-WELLER-000382); see also Ex. 4, 2014 DG Employee Handbook, at 12 (DG-WELLER-000515) (same); Ex. 5, 2015 DG Employee Handbook, at 12 (DG-WELLER-000650) (same); Ex. 6, 2016 DG Employee Handbook, at 12 (DG-WELLER-000781) (same); Ex. 22, DG Welcome PowerPoint, at 8 (WELLER-PLF000310) ("1 minute = tardy" and tardy is "Late returning from break or lunch (30 minute lunch)"); ECF 36-11, Weller Dep. 81-82, 242:11-15 ("if I clocked in a minute or two late from lunch, I would get pulled in the office and written up for a tardy.") Indeed, on January 26, 2016, Plaintiff received a Dollar General Progressive Counseling Form after clocking in late from lunch break. The Form stated:

> Today, on the above-mentioned date, you were observed clocking in late from lunch. This is the fifth tardy in the last three week (sic). Extended breaks and lunches is a violation of company policy and will not be tolerated. This concern has been communicated and addressed repeatedly during the start-up meetings. You need to be aware that further infractions of this kind will result in additional accountability up to, and including, termination.

ECF 36-17.

On the other hand, 12 of the declarants averred that each is off-duty at least 30 minutes for meal breaks, that an early clock-in from meal breaks is due to travel time and that each does not perform work while traveling to and from meal breaks. ECF 45-2. In addition, 4 declarants averred that none of them were disciplined or reprimanded for clocking in on a few occasions from a meal break after 30 minutes. ECF 45-15, Hare Decl. at ¶ 13; ECF 45-21, Mingucha Decl. at ¶ 16; ECF 45-24, Rivera-Vega Decl. at ¶ 10 and ECF 45-25, Shaud Decl. at ¶ 13. Indeed, DG's expert, David Lamoreaux, Ph.D, details in his expert report examples of six employees who had meal break times of between 31 and 37 minutes. ECF 45-11, at p. 5.  According to Dr. Lamoreaux, even though these employees have been "off the clock for more than 30 minutes, [DG's] rounding policy will credit them for the difference and treat them as if they had only taken a 30-minute meal period." *Id*. In addition, none of these six employees were ever disciplined or terminated. ECF 45-30, Zappacosta Decl. at 3-4.

Finally, at the end of the workday, there is no guaranteed stop time for employees at the Bethel Distribution Center. Instead, they work until they have completed that day's assignment, which can vary from employee. ECF 45-12, Dengler Decl. ¶ 6; ECF 45-13, Fusselman Decl. at ¶ 17; ECF 45-15, Hare Decl. at ¶ 5; ECF 45-17, R. Kreiser Decl. at ¶ 5; ECF 45-18, S. Kreiser Decl. ¶ 12 and ECF 45-21, Mingucha Decl. at ¶ 19. Thus, the practice of requiring employees to clock-out within 7 minutes of the end of their shift is equally likely to result in rounding favoring the employee as it is in rounding favoring DG. For example, an employee who finishes work at 5:02 p.m. and

who clocks out seven minutes later at 5:09 p.m. will have his time rounded forward to 5:15 resulting in that employee receiving compensation for an additional six minutes of time he did not work. Indeed, Plaintiff's own expert, Dr. Crawford, states that his data "showed that cases of rounding causing increases in measured worktime were more common than cases of rounding causing decreases." ECF 36, Ex. A, p. 19, FN 24. *See also* ECF 45-11, Dr. Lamoreaux's Report at pp. 8-9.

In its Efficient Distribution Center Operations Facilitator Guide, DG considers a "Total Work Day" to consist of 480 minutes. ECF 36-19, at 103 (ESI-DG-WELLER0001182-1357, at 1286. Included in the calculation of 480 minutes is 59 minutes of what Dolgencorp refers to as "Non Productive Paid Time" which consists of a "Pre-Shift Allowance" of 15 minutes, "Paid Breaks" of 30 minutes, additional time to walk from breaks and lunch amounting to 9 minutes, and an end of shift allowance of 5 minutes. *Id*.

By agreement of the parties, DG produced time records covering 15,088 shifts for a group of 73 randomly selected distribution center employees who worked at the Bethel Distribution Center at any time from January 1, 2014 through January 11, 2018. Plaintiff's expert, Dr. Crawford, performed the random selection.

After examining these employee records, Dr. Crawford found that of the 73 employees, 68 experienced a net time loss due to rounding. ECF 36, Ex. A at ¶¶ 4-9. He further found that the total net time loss for all employees was 83,735 minutes (1,396 hours) and that the average net time loss per employees was 1233 minutes (21 hours). *Id* at 4, ¶¶ 24-25. Dr. Crawford found that the total net straight time loss of all

**19**

employees was 26,009 minutes (433 hours), the average net straight loss per

employees was 378 minutes ( 6 hours), the total net overtime loss was 57, 726 minutes

(962 hours) and the average net overtime loss per employee was 876 minutes (15

hours). *Id*.

Plaintiff claims that Dr. Crawford's findings illustrate that the 7-minute clock-in

rule was enforced by DG. Specifically, Dr. Crawford found that:

> 65. For 13,967 (92.6%) of the 15,088 shift starting times,
> rounding resulted in reductions of elapsed time. That is,
> 13,967 (92.6%) of the actual starting times were 1 to 7
> minutes before their rounded values so that rounding had the
> effect of reducing elapsed worktimes.
>
> 66. As I noted above, a summary of initial clock-ins is
> contained in Table B, which shows:
>
> a. 36.3% of all initial clock-ins were exactly 7 minutes prior to
> rounded times;
>
> b. 74.0% of all initial clock-ins were 4 to 7 minutes prior to
> rounded times; and
>
> c. Only 3.4% of initial clock-ins were 1 to 7 minutes after
> rounded times.
>
> 67. As may be seen in Table B, 92.6% of all initial clock-ins
> were prior to apparent shift start times and only 3.4% of clock-
> ins were late – after apparent shift start times.

ECF 36, Ex. A at ¶¶ 65-67.

Dr. Crawford concluded that Plaintiff lost worktime in 331 of his 366 shifts due to

DG's rounding policies, with a total net time loss of 2,509 minutes (42 hours), consisting

of 890 minutes (15 hours) of lost straight time and 1,619 minutes (27 hours) of lost

overtime. ECF 36, Ex. A at ¶¶ 7, 26.

Dr. Crawford calculated that out of the 73 employees, 67 (92%) collectively lost worktime totaling 21,647 net minutes (361 net hours) due to DG's rounding method for meal breaks. ECF 36, Ex. A at ¶¶ 8, 28, 61-63. The average loss per employee was 324 minutes (5 hours). *Id*.

### RULE 23 CERTIFICATION

Plaintiff requests that the Court certify the following proposed class under Rule 23:

> All persons who have worked as a non-exempt, hourly employee at Defendant's Bethel, Pennsylvania distribution center, during any workweek from May 18, 2013 to the present.

ECF 36 at 4.

Plaintiff contends that "DG had a systemic, Pennsylvania-wide practice of applying time clock rounding and 7- minute time-punch policies which purported to round employee time to the nearest 15-minute increment but systematically resulted in under-recording the actual time worked on the clock by distribution center employees. DG also systematically failed to pay its distribution center employees for time spent donning and doffing protective gear and other pre-shift, post shift, and meal break work. These policies were applied to all DG Pennsylvania distribution center employees and they resulted in employees not being paid for all the time they worked." ECF 36 at p. 4.

Generally, in order to certify a class action, a court must find that the four requirements of Rule 23(a) are met. Rule 23(a) allows class certification only if:

1) the class is so numerous that joinder of all members is impracticable;

2) there are questions of law or fact common to the class;

3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition, because Plaintiff seeks to certify a class action under Rule 23(b)(3), he must also satisfy the additional requirements of that subsection. Rule 23(b)(3) requires that "(i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010). "Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (internal quotation marks omitted). The court must find by a preponderance of evidence that the Plaintiff meets each of the Rule 23(a) and Rule 23(b)(3) requirements. *Id*. at 320.

## B. Rule 23(a) Requirements

### 1. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Plaintiffs bear the burden of showing "that there are *in fact* sufficiently numerous parties." *Hayes v. Wal-Mart Stores, Inc.,* 725 F.3d 349, 357 (3d Cir. 2013).

Plaintiffs may rely on either direct or circumstantial evidence to do so, and need not pinpoint an exact number of class members. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012). While there is no minimum number of plaintiffs required, if the "potential number of plaintiffs exceeds 40," the requirement is typically satisfied. *Marcus*, 687 F.3d at 595. As Plaintiff estimates that the number of putative class members at the Bethel Distribution Center alone is about 500, the numerosity requirement is easily satisfied.

 2. *Typicality*

     The typicality requirement of Rule 23(a)(3) ensures that the named plaintiff's claims and those of the class are sufficiently interrelated that their interests will be aligned. *Beck v. Maximus, Inc.,* 457 F.3d 291, 295-96 (3d Cir. 2006). The requirement is "intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 631 (3d Cir. 1996). When the named plaintiffs challenge the same unlawful conduct that affects the putative class, the requirement is usually met "irrespective of the varying fact patterns underlying the individual claims." *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 58 (3d Cir. 1994).

     Plaintiff, like other putative class members, alleges that DG maintained a rounding policy that deprived him of time he actually worked after clocking-in but before his shift began, during meal breaks and after his shift ended but before he clocked-out. Since Plaintiff is claiming that he and the other putative class members were not paid for the

time that they actually worked due to DG's rounding policies, the Court finds that the typicality requirement has been met.

### 3. Adequacy of representation

"The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 393 (3d Cir. 2015). The inquiry therefore focuses primarily on whether the class representatives have conflicts of interest with the putative class members; it does not require that the representatives possess more than "a minimal degree of knowledge necessary to meet the adequacy standard." *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 313 (3d Cir. 2007). Moreover, only a "fundamental" conflict of interest will be sufficient to impact the adequacy analysis. *Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170, 183 (3d Cir. 2012). "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* (internal quotation marks omitted).

Class counsel are well-known and able members of the bar who specialize in these types of cases. As class representative, Plaintiff is claiming on behalf of the class members that he is not being compensated for time actually worked and is seeking the same remedies as the putative class. Therefore, the Court finds that this factor has been satisfied.

### C. Rule 23(b)(3) Requirements

*Commonality and Predominance*

Rule 23(b)(3) also requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members." The purpose of the requirement is to determine whether the proposed class is "sufficiently cohesive" to warrant class treatment. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

The predominance inquiry is similar to, but more stringent than, the commonality inquiry under Rule 23(a)(2). *See Peroxide*, 552 F.3d at 311. Because of this, it is appropriate to treat the commonality inquiry as subsumed into the predominance inquiry in Rule 23(b)(3) class actions. *Reyes v. Netdeposit, LLC,* 802 F.3d 469, 486 (3d Cir. 2015).

 The predominance inquiry considers whether the common issues in a putative class action "are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo,* __ U.S. __, 136 S.Ct. 1036, 1045, 194 L.Ed.2d 124 (2016) (internal quotation marks omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages...." *Id.* (internal quotation marks omitted). In analyzing the predominance factor, courts must determine not only whether there are common questions of law or

fact, but whether **those questions are capable of class-wide answers through
common evidence**. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011); *Ferreras
v. American Airlines, Inc.*, 946 F. 3d 178 (3d Cir. 2019) (emphasis added.).
"Dissimilarities with the proposed class are what have the potential to impede the
generation of common answers." *Wal-Mart*, 564 U.S. at 350.

Ultimately, "[t]o assess whether predominance is met at the class certification
stage, a district court must determine whether the essential elements of the claims
brought by the putative class are 'capable of proof at trial through evidence that is
common to the class rather than individual to its members.' " *Gonzalez v. Corning*, 885
F.3d 186, 195 (3d Cir. 2018). This analysis requires the Court to "examine the essential
elements of [the] claims on behalf of the ... [c]lass, as well as the evidence they propose
to use." *Id.*

Plaintiff correctly identifies several questions that are common to the class
including whether applying a time clock rounding policy which purports to round
employee time to the nearest 15-minute increment actually systematically results in
under-recording the actual time worked on the clock by distribution center employees;
whether applying a time clock rounding policy which rounds employee meal break time
to the nearest 15-minute increment actually systematically results in under-recording the
actual time worked by distribution center employees; whether requiring distribution
center employees to clock in seven minutes before the start of their shifts which, in
conjunction with the rounding policy, actually contributes to the systematic under-
recording of the actual time worked on the clock by employees; and whether failing to

pay distribution center employees for time spent donning and doffing protective gear and other pre-shift, post-shift, and meal break work that is more than de minimus and performed for Defendants' benefit violates the PMWA, WPCL and the law of unjust enrichment. Am. Compl. at ¶ 3.

However, the Court finds that the answers to these questions cannot be gleaned by common evidence such as Dr. Crawford's statistics or the Kronos system. The PMWA requires that "[e]very employer shall pay ... each of his or her employe[es] wages for all hours **worked**." 43 Pa. Cons. Stat. § 333.104(a) (emphasis added.) While the statistics of Dr. Crawford are appealing on the surface, they fail to account for whether time spent on the clock but off shift was "compensable" time. Put another way, Dr. Crawford failed to address whether employees were actually performing compensable work during the minutes that were rounded away. Indeed, Dr. Crawford admitted this several times during his deposition. ECF 45-10, Crawford Dep. at 25 ("I'm not opining about what's compensable and what isn't compensable."); *id*. at 62 (As I've said several times, I'm not offering any opinion about compensability of any component of time on the clock.").  Rather, Dr. Crawford admitted that he was doing an analysis on the difference between time on the clock and rounded time. *Id*. at 66.[2]

Dr. Crawford's statistics prove only that employees are compensated for less time than they are clocked in, not that they are compensated for less time than they actually worked. Therefore, in order to demonstrate that they were entitled to wages

---

[2] Dr. Crawford also admitted end-of-shift rounding actually works to the benefit of the employee. *Id*. at 101-102. And, as reported by Dr. Lamoreaux, the 73 randomly chosen employees actually gained a total of 184 hours and 31 minutes as a result of end-of-shift rounding. ECF 45-11, Expert Report of Dr. Lamoreaux at p. 8.

during the time they were on the clock but off shift, Plaintiff and the putative class members would have to rely on foundational evidence showing that the class members were performing actual work for DG when they were clocked in but not being paid due to DG's rounding policy.

The record reveals that the putative class members engaged in a wide variety of activities during the period after they clocked-in but before their shift started. ECF 45-3, Summary Chart B, "Pre-Shift Activities." Aside from Plaintiff, not one putative class member has testified or declared that there was a policy at DG which required an employee to perform compensable work activities during the time he was on the clock but not on-shift. Instead, most declared that they used this time to walk to and from their respective workstations or start-up meetings so that they would have enough time to be present exactly when their shift began on the hour or half-hour. ECF 45-18, S. Kreiser Decl. at ¶ 9 (does not work between clocking-in and start-up meeting); ECF 45-13, Fusselman Decl. at ¶16 (same); ECF 45-21, Mingucha Decl. at ¶ 7 (same and not aware of any start-up meeting that started before 6:00 a.m.). They also declared that they engaged in a number of different activities from the time they finished their work until the time they clocked out. ECF 45-13, Fusselman Decl. at ¶10 ("When I finish my job duties, I walk to the front of the building (while on the clock) so that I can clock out at the time clocks closest to the employee exit."); ECF 45-16, Harris Decl. at ¶13 (unless he is in a hurry, he walks to the time clocks further away from his worksite to stay on the clock longer); ECF 45-23, Nelson Decl. at ¶15 (grabs her personal effects before clocking out); ECF 45-15, Hare Decl. at ¶14 (after stopping work, collects personal belongings and walks to time clocks by front entrance).

Although Plaintiff testified that he attended start-up meetings after he punched-in but before his shift began, he is the only hourly employee to allege so. On the contrary, many of the 16 declarants declared that the start-up meetings began after the start of shift. ECF 45-3, 1(B) Summary Chart B, Column C; ECF 45-28, Ferguson Decl. ¶5; ECF 45-27, Delgado Decl. ¶¶5-6. Even employees who worked with Plaintiff and attended the same start-up meetings that Plaintiff attended averred that these meetings did not start before the start of a shift. ECF 45-20, Mehler Decl. ¶10; ECF 45-28, Ferguson Decl at ¶¶4-5 (As a supervisor, he conducted start-up meetings attended by Plaintiff, and began them two minutes after the start of a shift). Finally, some hourly employees, including maintenance technicians, WMS clerks and sanitation workers, declared that that they are not required to even attend a start-up meeting. ECF 45-12, Dengler Decl. ¶11; ECF 45-15, Hare Decl. ¶¶ 3, 12. ECF 45-23, Nelson Decl. ¶¶3, 12 ECF 45-25, Shaud Decl. ¶11.

As for donning and doffing, Plaintiff has failed to identify any policy at DG's Bethel Distribution Center that required hourly employees to store their gear in company lockers or "don and doff" their gear before or after shifts, during meals or in the locker room while not being compensated. On the contrary, the donning and doffing routines and requirements of the hourly workers varied by position and individual with some positions not requiring any PPE/ gear at all.  For example, some putative class members took their gear home between shifts. See ECF 45-17, R. Kreiser Decl. at ¶¶7-9 (As a yard jockey, he keeps issued safety shirts at home and safety vest in car); ECF 45-16, Harris Decl. at ¶5 (As a stocker, he sometimes took sleeve and glove home). Other putative class members stored gear at their specific job worksites and not in

lockers. ECF 45-13, Fusselman Decl. at ¶¶13-15 (safety vest kept in worksite office; harness kept in Repack area; PPE provided by supervisor during shift (and not kept in a locker)); ECF 45-26, Telford Decl. at ¶9 (disposable gloves kept at worksite); ECF 45-23, Nelson Decl. at ¶7 (safety vest kept in worksite desk); ECF 45-20, Mehler Decl. at ¶5 (As a Picker, kept headset, canister, and box cutter in outbound office; retrieved after SUM).

In fact, most of the declarants averred that they donned their PPE/gear at their workstation, after they had clocked-in and usually after their start-up meeting. See ECF 45-6, Summary Chart E (PCM Donning and Doffing Practices); ECF 45-12, Dengler Decl. at ¶7 (carried gear from locker to SUM; donned belt or harness after SUM); ECF 45-16, Harris Decl. at ¶¶9, 14, 16-17 (puts on his sleeve and glove at worksite after SUM; carried gear from locker to SUM; did not don gear at locker; only donned belt and apron after stretching exercises at SUM); ECF 45-19, Mast Decl. at ¶¶7, 11 (harness, headset, and belt donned during or after SUM); see also ECF 45- 27, Delgado Decl. at ¶¶7, 8, 13 (donning gloves and aprons, if needed, after start-of-shift); ECF 45-28, Ferguson Decl. at ¶24 (same). Finally, some positions did not require any PPE/gear and those employees never engaged in "donning or doffing." See ECF 45-27, Degaldo Decl. at ¶ 7 (Pickers in RePack have no required PPE/gear); ECF 45-12, Dengler Decl. at ¶ 5 (no PPE/gear in certain positions); ECF 45-28, Ferguson Decl. at ¶23 (same); ECF 45-13, Fusselman Decl. at ¶¶4, 6 (does not wear PPE/gear); ECF 45-15, Hare Decl. at ¶ 6 (same); ECF 45-23, Nelson Decl. at ¶ 7 (same). This evidence demonstrates that the hourly employees' donning and doffing schedules and requirements substantially varied

according to department, position and shift and therefore the donning and doffing claims cannot be adjudicated collectively.

As for meal breaks, Plaintiff argues that the Kronos system deducts thirty minutes automatically from Plaintiff's hours worked, regardless of whether or not he worked during his meal break. However, many of the declarants averred that they were automatically relieved from performing any compensable work for at least 30 minutes during meal breaks, they clocked-in early from meal breaks due to travel time and that they did not perform any compensable work while traveling from meal breaks. ECF 45-2. Thus, even if the employees were clocked out for less than the full 30 minutes, Plaintiff has not shown any evidence that even these employees were not relieved from all duties for 30 minutes or more.

Although Plaintiff contends that he was disciplined for clocking out for more than 30 minutes after a meal break, many of the declarants averred that they were not routinely and uniformly disciplined for clocking out for more than 30 minutes. ECF 45-15, Hare Decl. ¶13; ECF 45-21, Mingucha Decl. ¶16; ECF 45-24, Rivera-Vega Decl. ¶§10; ECF 45-25, Shaud Decl. ¶13. See also ECF 45-11, Expert Report of David Lamoreaux, Ph.D., p. 5 (examples of six employee meal break clock-out times between 31 and 37 minutes) and ECF 45-30, Zappacosta Decl. ¶¶ 3,4 (these same employees were not disciplined). Even though these employees clocked back in more than 30 minutes after the start of their break, the rounding policy worked in their favor by rounding back as if they had taken a 30-minute meal break and thereby compensating them for minutes that during which they were not performing compensable work. *Id*.

DG has demonstrated that significant variation exists as to whether hourly employees at the Bethel Distribution Center were actually working after they had clocked-in but before their shifts started or from the time after their shift ended and the time they clocked-out and during meal breaks. Therefore, DG has demonstrated that individualized inquiries would be required to determine whether employees were actually working and for how long during those times when they clocked-in early or clocked-out late.

The Court again notes that the time entries by themselves do not demonstrate that proposed class members must be paid for the time spent between the time punch and the employee's scheduled start time. Instead, Plaintiff will have to offer inherently individualized proof to demonstrate whether each putative class member was in fact working during the time periods at issue and for how long. In addition, the same inherently individual inquiries would need to be made concerning whether each hourly employee performed any actual work during meal breaks.

The facts of this case are analogous to those in a recent decision from our Court of Appeals, *Ferreras v. American Airlines, Inc.*, 946 F. 3d 178 (3d Cir. 2019). In *Ferreras*, the proposed class consisted of all non-exempt hourly American Airlines employees at Newark Airport. The complaint alleged that it was American Airlines' policy not to pay its employees for all time worked because the company's timekeeping system defaulted to paying employees based on their work schedules rather than on the time they actually spent working. *Id.* The Court found that two questions were common to the class:

32

> first, whether hourly-paid American employees at Newark
> airport are not being compensated for all hours worked, and
> second, whether American has a policy that discourages
> employees from seeking exceptions for work done outside of
> their shifts.

*Id*. at 185. The Court found that both questions could not be resolved without individual

inquiries predominating:

> The first question cannot be answered by common evidence
> about the timekeeping system because a yes or no answer
> tells us nothing about actual common work habits, if there are
> any. **The plaintiffs will still need to go through the process
> of proving that each individual employee worked
> overtime and is thus entitled to additional compensation,
> regardless of any common evidence about American's
> timekeeping system.**
> Similarly, the second question cannot drive resolution of the
> plaintiffs' case because, again, their claims are, at bottom,
> that they were not paid overtime compensation for hours
> worked, not that American's overarching policy regarding
> exceptions has deprived anyone in particular of compensation
> to which he or she was entitled.

*Id*. at 185–86 (emphasis added.). *See also Shiferaw v. Sunrise Senior Living*

*Management, Inc.*,  2014 WL 12585796, at *9 (C.D. Cal. June 11, 2014),  on

reconsideration in part, 2016 WL 6571270 (C.D. Cal. March 21, 2016); *Forrand v. Fed.*

*Exp. Corp*., CV 08-1360 DSF PJWX, 2013 WL 1793951 (C.D. Cal. Apr. 25,

2013) (individual factual inquiries predominate over classwide inquiries as to whether

employees were working or under the control of their employer while they were clocked

in prior to or after their shifts); *See's Candy Shops, Inc. v. Superior Court*, 210 Cal. App.

4th 889, 910-11 (2012) ("To the extent an employee claims that he or she was not

properly paid [for the time during which an employee punches in before his or her

compensable pay is triggered], this claim raises factual questions involving whether the

employee was in fact working and/or whether the employee was under the employer's control during the grace period.")

Plaintiff argues that no individual inquiries are necessary because DG's Employee Handbook specifically states that employees are "required to clock-in **when they start to work**" ECF 36-3, 2013 DG Employee Handbook, at 8 (DG-WELLER-000365-419, at 378) and DG's Employee Handbook Supplements from 2013-2015 state that employees are "required to "clock in/out **when they start to work**." ECF 36-8, 36-9, 36-10, 2013-2015 DG Distribution Center Employee Handbook Supplement, at 2 (DG-WELLER000420-427, at 422, (DG-WELLER000554 - 561, at 556); Ex. 10, 2015 DG Distribution Center Employee Handbook Supplement, at 2 (DG-WELLER-000690 - 698, at 692)(emphasis added.) Plaintiff interprets this language to mean that once a putative class member clocked-in, that class member was automatically considered by DG to be working and no further inquiry is necessary.

In the first instance, Plaintiff has not produced any evidence that DG had a policy that required the putative class members to engage in actual work immediately upon clocking in and before their shift began.  Plaintiff cites no cases in which a court has found that the kinds of general employment policies such as those contained in DG's Employee Handbooks alone are sufficient to establish a legally binding obligation to compensate for time that is not actually spent working.

Second, the language cited by Plaintiff does not establish that all putative class members were actually working or expected to be working during the period after they clocked-in but before their shift started. Many of the declarants averred that they simply took this time to walk to their workstations for their start-up meeting while others chatted

with fellow workers, greeted a secretary, picked up gear or accessed their lockers. ECF 45-3, Column A. Determining whether the putative class members were working during the period after they clocked-in but before they started shift will therefore entail individual inquiries.

For these reasons, Plaintiff has not met his burden of demonstrating that this is a claim for which common questions predominate. The record evidence reveals that there is a vast disparity among the actions taken by the hourly employees at the Bethel Distribution Center from the time they clock-in until their shift begins, from the time their shift ends and the time they clock-out and during meal breaks.

Since the Court has concluded that Plaintiff has failed to meet his burden of showing that common questions predominate, the Court need not reach the additional issue of superiority under Rule 23(b)(3). Therefore, the Motion for Class Certification under Rule 23 is denied.

## CONDITIONAL FLSA COLLECTIVE CERTIFICATION

The FLSA, in pertinent part, requires employers to pay overtime wages for those hours worked more than forty hours a week at a rate of "not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207 (2006).  Plaintiff seeks conditional certification of the following Collective Action Class under the FLSA:

> All persons who have worked as a non-exempt, hourly employee at any of Defendant's distribution centers, during any work week from May 18, 2014 to the present.

ECF 36 at 3.

According to Plaintiff, "DG's rounding and 7-minute time-punch policies apply to each and every member of the Collective Action Class, and these practices and policies deny overtime pay for compensable work." EFC 36 at p. 4.

A collective action under the FLSA

> may be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). "Thus, the twin requirements for a class action to proceed under [§ 216(b)] are that the employees in the class must be 'similarly situated' and that each class member must file an individual consent." *Sperling v. Hoffman–La Roche, Inc.,* 862 F.2d 439, 444 (3d Cir.1988).

Courts in the Third Circuit apply a two-step certification process to FLSA collective actions. *Halle v. W. Penn Allegheny Health Sys. Inc.,* 842 F.3d 215, 224 (3d Cir. 2016). The first step, conditional certification, normally requires only a "modest factual showing" that there is a "factual nexus between the manner in which the employer's alleged policy affected [the named plaintiff] and the manner in which it affected the proposed collective action members." *Id.* This standard requires a plaintiff to "produce some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Holley v. Erickson Living,* 2012 WL 1835738, at *3 (E.D. Pa. May 21, 2012).The second step, final certification, is where the court "makes a

conclusive determination as to whether each plaintiff who has opted into the collective

action is in fact similarly situated to the named plaintiff." *Adami v. Cardo Windows,*

*Inc.,* 299 F.R.D. 68, 78 (D.N.J. 2014) (internal quotation marks omitted).[3]

---

[3]     With regard to the first step, DG asks the Court to apply a test that requires a "more searching standard" than the typical "modest factual showing" to Plaintiff's claims. *See Swank v. Wal-Mart Stores, Inc.* 2018 WL 2684102 at * 8-10 (W.D. Pa. June 5, 2018). The "more searching standard "is greater than the modest factual showing need for conditional certification, but less than the conclusive determination of whether the proposed class members are substantially situated. *Id.* at * 10. DG bases its request on the fact that Plaintiff did not move for conditional certification until 15 months after the original Complaint was filed and after the parties had already engaged in substantial pre-certification discovery. DG also points out that the fact that Plaintiff filed his motion for conditional certification at the same time he filed his motion for Rule 23 certification (which requires a more rigorous inquiry by the Court), reveals that even Plaintiff does not really believe any more pre-certification discovery needs to be done. The Court agrees.

The record reveals that the parties engaged in pre-certification discovery for over one year before Plaintiff filed his joint Motion for Conditional Certification and for Class Certification. According to the Declaration of DG's counsel, Plaintiff propounded 185 written discovery requests to DG and DG produced thousands of pages of documents related to its policies and procedures at its nationwide distribution centers. ECF 45-1.Plaintiff also deposed four of the 16 Declarants and also took a Rule 30(b)(6) deposition of DG's corporate representative. During a case management conference, the Court directed DG to produce a sample of time clock records for 75 putative class members at the Bethel Distribution Center. DG complied and produced Excel spreadsheets regarding a group of 73 randomly-selected putative class members at its Bethel Distribution Center (15% of its workforce). Plaintiff retained Dr. Crawford to conduct analysis of these time records who then offered an opinion on the issue of certification. DG deposed Dr. Crawford. DG also deposed Plaintiff and propounded 64 discovery requests which resulted in Plaintiff producing 1,676 pages of documents. Plaintiff never moved the Court to compel any further discovery and elected not to depose the four additional declarants permitted by the Magistrate Judge for the *Gulf Oil* hearing. Plaintiff could have filed his Motion for Conditional Class Certification at any time during the pre-certification discovery period, but instead chose to file it in combination with his Rule 23 Class Certification Motion. Indeed, in *Swank*, the Court decided to apply a "more searching standard" than the "modest factual showing standard" because "the current evidentiary record was developed enough to meet each factor of Rule 23's certification analysis" and thus "[i]t makes little sense to disregard this voluminous record in considering the 216(b) certification of the Plaintiff's Motion." *Id.* at *9.

In addition, Plaintiff testified that he contacted two potential members about joining this suit and put them in touch with his attorneys. Weller Dep. 27-31. Plaintiff's law firm has publicized this case on their website, inviting "employee[s] of Dollar General" who "believe [they] may have a claim for unpaid wages" as a result of DG's rounding policy and failure to pay warehouse workers for donning and doffing, to contact the firm either telephonically or through the submission of an online inquiry. http://www.axlergoldich.com/cases-investigations/dollar-general.

Given the amount of pre-certification discovery that has taken place in this case and the fact that this discovery has not uncovered a single opt-in class member or a single witness who is willing to support Plaintiff's claims, and that for reasons discussed in the Rule 23 section of this Opinion, even if a conditional class was certified it would almost certainly be decertified after any further discovery, the Court concludes that any further pre-certification discovery would be of no avail. As a result, the Court will apply the "more searching standard" used by the Western District of Pennsylvania in *Swank* and consider

In considering whether the proposed collective plaintiffs are similarly situated, our Court of Appeals takes an "ad-hoc" approach "which considers all the relevant factors and makes a factual determination on a case-by-case basis." *Zavala v. Wal Mart Stores*, 691 F. 3d 527, 536 (3d Cir. 2012). "Relevant factors include (but are not limited to): whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment. Plaintiffs may also be found dissimilar based on the existence of individualized defenses." *Id*. at 536-537. "This list is not exhaustive, and many [other] relevant factors have been identified[,]" including the extent to which members of the proposed class will rely upon common evidence and fairness and procedural considerations. *Id*. The burden is on the Plaintiff to "demonstrate by a preponderance of the evidence that members of a proposed collective action are similarly situated" for purposes of final certification. *Id*.

"Being similarly situated does not mean simply sharing a common status, ... [r]ather, it means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Id*. at 538. General allegations

---

all of the evidence submitted and not rely solely on the allegations contained in Plaintiff's Amended Complaint.

of an overarching employer policy "are insufficient, and plaintiffs are required to produce substantial evidence of a single decision, policy, or plan." *Andrako v. United States Steel Corp.,* 788 F.Supp.2d 372, 378 (W.D.Pa.2011) Where an employer maintains a formal policy of lawful compensation, plaintiffs must present "substantial evidence that [the employer], in fact, shirked its FLSA responsibilities." *Camesi v. University of Pittsburgh Med. Cent.,* 2011 WL 6372873, at *4 (W.D. Pa., Dec.20, 2011).

The biggest obstacle Plaintiff faces in seeking even conditional certification of an FLSA collective action is that not a single putative class member has provided testimony or a declaration in which they claimed to be similarly situated to Plaintiff. As a result, Plaintiff seeks to certify a nationwide class of thousands of DG non-exempt hourly employees based solely on his own allegations and testimony.

Plaintiff first claims that DG's policy of rounding clock-in and clock-out punches to the nearest quarter hour is unlawful under the FLSA because it is not facially neutral or neutral in practice, i.e. it works only to the advantage of the employer. To support this claim, Plaintiff relies on Dr. Crawford's expert report containing a detailed analysis of timekeeping records from a sample of 73 putative class members at DG's Bethel Distribution Center. After examining these employee records, Dr. Crawford found that of the 73 employees, 68 experienced a net time loss due to rounding. ECF 36, Ex. A at ¶¶ 4-9. He further found that the total net time loss for all employees was 83,735 minutes (1,396 hours) and that the average net time loss per employees was 1233 minutes (21 hours). *Id* at 4, ¶¶ 24-25. Dr. Crawford found that the total net straight time loss of all employees was 26,009 minutes (433 hours), the average net straight time loss per

employees was 378 minutes ( 6 hours), the total net overtime loss was 57,726 minutes (962 hours) and the average net overtime loss per employee was 876 minutes (15 hours). *Id*.

As to Plaintiff specifically, Dr. Crawford concluded that Plaintiff lost worktime in 331 of his 366 shifts due to DG's rounding policies, with a total net time loss of 2,509 minutes (42 hours), consisting of 890 minutes (15 hours) of lost straight time and 1,619 minutes (27 hours) of lost overtime. ECF 36, Ex. A at ¶¶ 7, 26.

However, the mere presence of a rounding policy by DG is not unlawful. Rather, as discussed, *supra*, Plaintiff and the putative class members would need to prove that the application of DG's rounding policy deprived Plaintiff and putative class members of wages for time actually worked in violation of the FLSA. For 60 years, the United States Department of Labor has adopted a regulation regarding rounding practices:

> It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour.  Presumably, this arrangement averages out so that the employees are fully compensated for all the time they **actually work**.  For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have **actually worked**.

29 C.F.R. § 785.48(b) (emphasis added). The federal rounding rules have long been applied to federal claims brought pursuant to the FLSA.  *See, e.g., Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122, 1126 (C.D. Cal. 2011) District courts have approved an

employers' rounding policy under the FLSA as long as it is facially neutral. For example, in *Alonzo*, 832 F. Supp. 2d at 1126, the court found that an employer complies with the federal regulation if it "applies a consistent rounding policy that, on average, favors neither overpayment nor underpayment." Similarly, in *East v. Bullock's Inc.*, 34 F. Supp. 2d 1176,1184 (D. Ariz. 1998), the court found that because "[d]uring the same time period in which [the plaintiff] was 'underpaid,'" she was "also 'overpaid,'" the employer's "rounding practices average[d] out sufficiently to comply with § 785.48(b)."  The employer's rounding practice, the court held, "may not credit employees for all the time actually worked, but it also credits employees for time not actually worked."  Id.

An employer's rounding practices violate § 785.48(b) if they systematically undercompensate employees.  *See, e.g., Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 820 (N.D. Ill. 2010) (time rounding and log-out policies may violate FLSA if they "cause[] plaintiffs to work unpaid overtime"); *Austin v. Amazon.com, Inc.*, No. C09-1679JLR, 2010 WL 1875811, at *3 (W.D. Wash. May 10, 2010) (denying defendant's motion to dismiss where policy "allows rounding when it benefits the employer without disciplining the employee; but disciplines the employee when the rounding does not work to the employer's advantage"); *Eyles v. Uline*, No. 4:08-CV-577-A, 2009 WL 2868447, at *4 (N.D. Tex. Sept. 4, 2009) (granting summary judgment for plaintiff where defendant's rounding policy "encompasses only rounding down"); *Chao v. Self Pride,* Inc., No. Civ. RDB 03-3409, 2005 WL 1400740, at *6 (D. Md. June 14, 2005) (ruling that employer's practice of rounding employee time down violated FLSA).

Again, resolution of these issues will require individual inquiries into the whether the activities engaged in by the putative class members during the relevant time periods

constituted actual work. For example, many of the declarants averred that they spent the time after clocking-in and after finishing their shift walking from time clocks to their workstations and vice versa. The Portal-to-Portal Act, 29 U.S.C. 254(a), exempts the following activities from compensation under the FLSA:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities ....

29 U.S.C. § 254(a).

The Supreme Court has held that any work-related activity that is "integral and indispensable" to a "principal activity" is itself a "principal activity" under the Portal-to-Portal Act and is therefore compensable. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005). The Department of Labor has issued interpretive statements giving examples of non-compensable travel under section 254(a):

> Examples of walking, riding, or traveling which may be performed outside the workday and would normally be considered "preliminary" or "postliminary" activities are (1) walking or riding by an employee between the plant gate and the employee's lathe, workbench or other actual place of performance of his principal activity or activities; (2) riding on buses between a town and an outlying mine or factory where the employee is employed; and (3) riding on buses or trains from a logging camp to a particular site at which the logging operations are actually being conducted.

29 C.F.R. § 790.7(f).

The Supreme Court also disposed of this issue in *Alvarez* when it noted, "walking from a timeclock near the factory gate to a workstation is certainly necessary for employees to begin their work, but it is indisputable that the Portal–to–Portal Act evinces Congress' intent to repudiate *Anderson's [v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 691–92 (1946)]* holding that such walking time was compensable under the FLSA." *Alvarez*, 546 U.S. at 541.

As a result, individual inquires of thousands of nationwide putative class members would be necessary to find out how much of the relevant time periods they spent walking (or driving) from the time clocks to and from their workstations.

In short, the Court finds that the Plaintiff has failed to prove by a preponderance of the evidence that that he and other putative members of the class are similarly situated because they cannot, **as a class**, show that DG deprived them of wages earned in violation of the FLSA. Rather**,** resolution of these issues will require individual inquiries into the whether the activities engaged in by the putative class members during the relevant time periods constituted actual work. Therefore, the Plaintiff's motion for conditional certification under the FSLA is denied.